# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Lambert v. Downers Grove Fire Department Pension Board*, 2013 IL App (2d) 110824

---

| | |
|---|---|
| Appellate Court Caption | EDWARD LAMBERT, Plaintiff-Appellant, v. THE DOWNERS GROVE FIRE DEPARTMENT PENSION BOARD, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-11-0824 |
| Filed<br>Rehearing denied | February 21, 2013<br>March 20, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The denial of plaintiff's application for a line-of-duty disability pension was reversed and the cause was remanded to the pension board with directions to enter an order granting the application, since the board's decision was against the manifest weight of the evidence, especially when plaintiff was found not credible as to matters tangential to the questions at issue, and the medical evidence of plaintiff's disability that was found credible was discounted by the board because of the finding that plaintiff was not credible. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 11-MR-183; the Hon. Robert G. Gibson, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Barry A. Ketter, of Barry A. Ketter, P.C., of Chicago, for appellant.

Lance C. Malina and Jacob H. Karaca, both of Klein, Thorpe & Jenkins,
Ltd., of Chicago, for appellee.


Panel

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justice Jorgensen concurred in the judgment and opinion.
Justice McLaren dissented, with opinion.


**OPINION**

¶ 1    Plaintiff, Edward Lambert, a firefighter/paramedic employed by the Village of Downers Grove, applied for a line-of-duty disability pension from defendant, the Downers Grove Fire Department Pension Board (Board). Following a public hearing, the Board denied the request for the pension. Lambert then sought administrative review in the circuit court of Du Page County. The trial court upheld the Board's decision, and Lambert now appeals from the trial court's order. We reverse and remand.

¶ 2                                I. BACKGROUND

¶ 3    Lambert was hired as a firefighter by the Village of Downers Grove in March 1997. On September 10, 2009, Lambert filed an application with the Board, seeking a line-of-duty disability pension because of a right-knee injury that "just is not responding to treatment which would allow [him] to return to active duty." At the public hearing held on March 16, 2010, Lambert testified that, in September 2005, he injured his right knee during a training exercise. He "had a pop" in the knee and felt "excruciating pain." After going to the hospital, he was given a knee brace and was taken off duty for one month. On October 27, 2008, he was running on a treadmill during a mandatory fitness program when he had "excruciating pain" in his right knee. He told his lieutenant and filled out an accident report. He then completed his shift.

¶ 4    The next day, Lambert saw an orthopedic doctor, Dr. Gluek, and had a magnetic resonance imaging (MRI) of his right knee. Gluek recommended "conservative care." Lambert sought a second opinion from Dr. David Mehl, who recommended arthroscopic surgery on the right knee, which Lambert underwent in April 2009. He had a second surgery on December 22, 2009, during which "debris and scar tissue" were removed.

¶ 5    After the 2008 injury, Lambert favored his right knee; he limped, and when he stood up from a seated position, he had to put all of his weight on his left leg. This caused back pain that radiated down his legs and caused tingling and numbness in his feet. An MRI of his back revealed bulging discs and a possible hernia. A doctor who examined him for an independent

medical examination (IME) in his workers' compensation case opined that the leg and foot pain was a result of his diabetes. Lambert's treating physician for diabetes disagreed. Both the IME physician and Gluek advised him that he might need a total knee replacement at about age 50.

¶ 6    Lambert testified that he had undergone a functional capacity evaluation (FCE). During this evaluation, which he did not describe, he "fully expel[led] effort" to the best of his ability and was told to work through the pain that he experienced.

¶ 7    Lambert stated that he could not squat, kneel, crawl, or climb up or down ladders. Walking on stairs was difficult and painful. He was not allowed to carry more than 25 pounds; he could not carry a hose or an air pack, let alone a person. He still had problems with his back and his right foot, which still became numb. He also had neck pain and headaches and did not have full movement in his neck.

¶ 8    Under questioning from the Board members, Lambert testified that he used a treadmill or elliptical exercise machine three to four times a month before the October 2008 injury. He had experienced knee pain "continuously" since the September 2005 injury; the doctor had told him that he would have pain and "would have to deal with it." Since his December 2009 surgery, the pain "around the knee on the outside" was fine, but "[i]nside the knee [was] just not improving." He still had difficulty bending, kneeling, and squatting. His doctor described the problem as "maltracking," where the kneecap did not properly slide in its track when the knee was bent. His knee locked up, and he experienced pain and could lose his balance. The doctor gave him a brace to help stabilize the knee. Lambert did not think that he could "do the job of a fireman." He attended physical therapy three times a week, riding an exercise bike, doing basic exercises, and stretching. He weighed 260 pounds, 20 to 30 pounds more than when he started with the department. He had been with the department four or five years when he was first diagnosed with diabetes; his doctor diagnosed him as "a late onset Type 1." He used an insulin pump. He had taken Vicodin but he had stopped because his doctor wanted him to stop in order to prevent addiction.

¶ 9    Lambert had not been released to return to work since his second surgery, and he was not working in any capacity at the time of the hearing. He could not do any work around the house that required him to squat or get on his knees, nor could he do "any kind of heavy work."

¶ 10   Various incident reports, medical records, IME reports, and FCE reports were entered into the record. The three doctors who performed IMEs at the request of the Board all concluded that Lambert was disabled for service in the fire department as a firefighter. Dr. William Malik diagnosed Lambert as suffering from "significant chondromalacia of the right patella" and noted that, while Lambert did "not have a significant patellar grinding test," he did have "diffuse pain in the retropatellar area." Lambert had failed to significantly improve even after "reasonable therapy postoperatively" and various injections. Malik opined that Lambert had "reached the point of maximum improvement." Malik agreed with the July 21, 2009, FCE that had found Lambert to be able to perform around 85% of the demands of his job and found that he "cannot perform the full duties of a firefighter at the present time." Dr. Joseph Thometz found "advanced chondromalacia" and noted that Lambert had "structural problems with his knee that are causing pain that would preclude him from returning to his

duties as a fire fighter." Dr. Terrence Moisan noted that Lambert had undergone surgery, "significant physical therapy," and injections, "with no apparent improvement." His examination of Lambert's knee revealed "normal range of motion, minimal crepitations, but pain over the medial joint line." Lambert's strength and gait appeared normal. Based on his examination and review of FCE and other evaluations, Moisan opined that, while Lambert could safely perform job duties up to the medium and occasionally heavy level, it was unlikely that he would return to the "very heavy" level of job duties.

¶ 11    Four FCEs were conducted by METT Therapy Services between July 31 and November 3, 2009. The percentage of "job demands met" noted in the reports ranged from a low of 66% in July to a high of 85% in September, and the percentage of "consistent/valid tests" ranged from a high of 97% in August to a low of 83% in November. The FCEs noted that Lambert exhibited "pain behaviors of grimacing and grunting," especially while squatting and also while crawling, lifting, and climbing stairs and ladders. The August and September FCEs suggested that Lambert would benefit from continued work conditioning "in order to return to work full time without restrictions." The November FCE noted that the 83% consistency of effort/validity result "would suggest the client presented with segmental inconsistencies during this evaluation resulting in mild self limiting behaviors." Lambert was still able to perform only at the "heavy physical demand level," while his job was classified at the "very heavy physical demand level." As of the November FCE, Lambert was still "restricted from work."

¶ 12    The Board voted to continue the hearing, as Lambert's most recent surgery was after all of the IMEs and FCEs had been performed. The Board explained that some of the information received after the surgery "appears to at least reflect some significant change in [Lambert's] condition for the better."

¶ 13    The Board reconvened the hearing on September 7, 2010. Lambert submitted additional evidence that was made part of the record. Mehl, who had treated Lambert for over a year, opined in a May 7, 2010, letter that Lambert "has not made a sufficient recovery to be able to return to [*sic*] a firefighter." Further, Mehl opined that Lambert "is permanently disabled from his job as a firefighter."

¶ 14    Lambert also underwent an FCE on August 28, 2010, the summary report of which was made part of the record. Michael Hornbuckle, a certified work capacity evaluator, reported that the overall test findings, combined with clinical observations, suggested both that Lambert exerted full physical effort in the test and that Lambert's "subjective reports of pain and associated disability [were] both reasonable and reliable." After describing his findings regarding Lambert's ability to lift and carry weight, sit, stand, and walk, Hornbuckle summarized that Lambert "needs to be a full job match before he can return to work as a fireman, and he does not meet the full list of demands for his job at this time." While Lambert had "general tolerable pain levels with everyday activities," his pain levels increased "significantly with right knee flexion, direct pressure to the right knee, and loading of the right leg" such that, although he is "very strong," he "is limited in his abilities due to pain." Hornbuckle felt that Lambert would "have difficulty completing a work-conditioning program" at that time but suggested continued functional rehabilitation to help correct some noted "biomechanical hip faults" that added "undue stress to the right knee in gait, and have

the ability to contribute to his continued right knee dysfunction." He also recommended further discussions regarding pain control to help manage pain, but concluded that "at this time [Lambert] is not ready to return to work full time."

¶ 15    The record also included an August 30, 2010, report by Mehl, who noted that Lambert had "significant post-traumatic chondromalacia." Lambert had received "some mild pain relief" from Euflexxa injections given to him in May 2010. Mehl noted "good range of motion from 5 degrees to 125 degrees" and "nearly normal" strength, but also noted "severe cropitus throughout motion." He opined that Lambert "is not able to return to work as a firefighter and I believe this will be a permanent condition as a result of the injury to his knee and subsequent surgeries." Lambert "will be permanently disabled from work as a firefighter" and "is not a candidate for further work conditioning."

¶ 16    The Board then notified Lambert that, at its March meeting, it had authorized the use of a "surveillance data gathering service" to record Lambert's activities outside his house on the morning of August 24, 2010, and had just received a DVD of that surveillance. Although the surveillance had been made over approximately one hour, the camera had been turned off when Lambert was not seen; the actual recording lasted 27 minutes and 48 seconds. After viewing the DVD, Lambert had no objection to its admission, and the Board voted to "enter the surveillance evidence into evidence."

¶ 17    The Board then questioned Lambert regarding the new evidence. Lambert stated that he did not take any pain medication on the day of the August 2010 FCE, because the test would "not [be] a true evaluation of what my capabilities are." Lambert's counsel told the Board that Lambert would not be allowed to take one of his prescribed pain medications, Vicodin, if he returned to duty. Lambert stated that some days he could get by with taking only ibuprofen for pain, but some days he would take up to eight Vicodin. Pain often prevented him from going to sleep or staying asleep. During a discussion of Lambert's physical restrictions, the following took place:

> "[BOARD] PRESIDENT LAZZARA: Help me with this one, because you just said you can't kneel, you can't crawl, but yet you have been sitting in that chair twisting back and forth on that right knee. Help me.
>
> MR. LAMBERT: No, I am twisting on my left knee and I have my right knee on top of my foot.
>
> PRESIDENT LAZZARA: I have been watching you. I have been.
>
> MR. LAMBERT: So have I, I am not."

¶ 18    When asked about learning to manage his pain levels, Lambert stated that his doctor told him that pain management might help his everyday life but that it would not be sufficient to return him to work. He had made adjustments to the way that he walked and had worked on "certain aspects" of function rehabilitation of his hip. The Board commented that the August 2010 FCE noted that Lambert could sit comfortably for only about 30 minutes at a time, and the Board asked Lambert if he had driven for more than 30 minutes at a time. Lambert stated that he had driven almost two hours to get to the hearing that day. The Board then asked Lambert if he drove a large vehicle (he occasionally drove his wife's Suburban), if his house had stairs (14 stairs that he walked up and down 2 to 3 times daily), and if he used a ladder

to do home maintenance (no). After Lambert's counsel made a short closing statement, during which he mentioned, among other things, Lambert's inability, per the FCE, to lift 100 pounds and his difficulty climbing a ladder, Lazzara stated, "I have no question that he is disabled. What I am questioning is his credibility here." Lazzara asked Lambert again how many times a day he walked up and down the stairs (2 or 3) and how much he weighed ("200–"), then stated, "That is what I'm getting at, well over the 100 pounds. That's what I am getting at, the credibility." Counsel then explained that, in his view, the FCE showed that Lambert could move his own body but could not carry the additional weight.

¶ 19    Lambert testified that he had requested an extension to keep up his certification as a paramedic but was unsure of the status of that request. Battalion Chief Matt Beyer then testified that the extension was not granted; Lambert's license had expired, and he was no longer a paramedic. Because Lambert was hired as a firefighter/paramedic, he could not return to his job without the paramedic license.

¶ 20    The Board then unanimously passed a motion to deny Lambert's pension application for lack of disability. In its written findings issued later, the Board noted that the three IME doctors whom it had selected and Lambert's doctor all indicated that Lambert was "unable to perform the duties of a Firefighter." However, while finding the reports from those doctors "to be credible," the Board also found that the findings of disability "were based primarily on Firefighter Lambert's subjective statements of pain to the physicians." The Board noted that the IME doctors also considered the FCEs, and the Board was "not persuaded by portions of the FCEs that were based on Firefighter Lambert's subjective statements of pain to the therapists." The Board found Lambert "not to be a credible witness" as to his inability to perform the job of firefighter due to right knee pain; having "witnessed the physical position and demeanor" of Lambert during the two days of hearings, the Board found "his testimony regarding his level of pain not credible." Lambert was able to control his pain with Vicodin and/or ibuprofen and "could help learn to manage his pain levels on the job." The Board considered the surveillance DVD, which showed Lambert "in his yard walking up steps and carrying household objects with little trouble, activities that he has simultaneously testified that he has too much pain to perform (*i.e.*, sitting, climbing, lifting and jostling)." In addition, the Board considered evidence that Lambert had not properly renewed his paramedic certification and that he had driven to the September 7 hearing and "had been stuck in traffic for more than an hour, yet claimed an inability to sit long periods of time or operate/drive department vehicles."

¶ 21    Lambert then sought administrative review in the circuit court of Du Page County. After considering the briefs and arguments of the parties, the court found that there was "at least some evidence in the record to support the [B]oard's findings and decisions" and upheld the Board's decision denying Lambert's pension application. Lambert thereafter filed a timely notice of appeal.

¶ 22                                    II. ANALYSIS

¶ 23    Lambert first contends that the Board's decision to deny his application for a line-of-duty disability pension was against the manifest weight of the evidence. We agree. A disability pension "shall not be paid until disability has been established by the board by examinations

of the firefighter at pension fund expense by 3 physicians selected by the board and such other evidence as the board deems necessary." 40 ILCS 5/4-112 (West 2010). In an appeal from an administrative agency's decision, we review the agency's determination, not that of the trial court. *Szewczyk v. Board of Fire & Police Commissioners*, 2011 IL App (2d) 100321, ¶ 20. The agency's factual determinations are held to be *prima facie* true and correct, and we will uphold those determinations unless they are against the manifest weight of the evidence. *Goodman v. Morton Grove Police Pension Board*, 2012 IL App (1st) 111480, ¶ 24. A factual finding is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Szewczyk*, 2011 IL App (2d) 100321, ¶ 20. We review *de novo*, as a question of law, an agency's interpretation of a statute or an administrative rule. *Id.* Finally, we apply the "clearly erroneous" standard to mixed questions of law and fact. *Id.* An agency's decision is clearly erroneous when the reviewing court comes to the definite and firm conclusion that the agency has committed an error; this standard provides some deference based on the agency's experience and expertise and falls between the *de novo* and manifest-weight standards of review. *Id.* In such proceedings, the plaintiff bears the burden of proof. *Id.* If there is evidence of record that supports the agency's determination, it must be affirmed. *Roszak v. Kankakee Firefighters' Pension Board*, 376 Ill. App. 3d 130, 138-39 (2007). "However, if the agency relies on factors that the statute does not intend, fails to consider an issue, or the decision is so implausible, the decision may be reversed as arbitrary and capricious." *Ellison v. Illinois Racing*, 377 Ill. App. 3d 433, 440-41 (2007).

¶ 24    In *Roszak*, a firefighter filed for a line-of-duty disability pension. All three pension-board-appointed physicians found that the plaintiff was disabled or incapable of performing his duties as a firefighter. Nonetheless, the pension board found that the plaintiff was not entitled to a disability pension because he was not a credible witness. The pension board found that the plaintiff was not credible because of his evasive testimony and his lack of candor. Specifically, the pension board found that the plaintiff was evasive because he initially refused to give a residence address, he refused to state what he was currently earning, and he refused to answer questions as to his net worth. The pension board further believed that the plaintiff had exacerbated his condition by going on a snorkeling vacation, postponing surgery, and failing to see a doctor for months. The pension board rejected the plaintiff's explanation that he had not seen a doctor sooner due to workers' compensation and affordability issues. The pension board concluded that, if the injury were as serious as the plaintiff contended, he would have taken reasonable medical steps to promote recovery. *Roszak*, 376 Ill. App. 3d at 137. Further, the pension board discounted the findings of all of the doctors who had determined that the plaintiff was disabled, because such findings were based on their subjective determinations of what the plaintiff, whom the pension board declared not credible, had told them. Specifically, the pension board stated:

" '[T]he physicians who determined that [the plaintiff] is still disabled, based their findings on what the [plaintiff] told them and on subjective determinations. If the [plaintiff] was not truthful with this Board, we can assume that he was not truthful with the Board's examining physicians.' " *Id.* at 143.

After the pension board ruled that the plaintiff was not entitled to a disability pension, the trial court affirmed. *Id.* at 138.

¶ 25 The reviewing court then reversed, finding that several of the pension board's crucial findings used to deny the firefighter's disability were against the manifest weight of the evidence. *Id.* at 139. The reviewing court noted that the pension board found that the plaintiff was not credible because he was evasive in responding to questions about where he lived, where he worked, what he earned, and his current net worth. The reviewing court found that these issues were tangential at best to the issues before the pension board and did not impact the plaintiff's veracity concerning his injury. *Id.* at 140. The reviewing court found that the plaintiff's "evasiveness" was not wilful obstructionism but rather reflected that he was confused or did not understand the pension board's questions. *Id.* at 141.

¶ 26 The reviewing court further rejected the pension board's finding that the plaintiff engaged in "symptom magnification." *Id.* at 142. The court noted the pension board's example that the plaintiff claimed that he was in constant pain and needed surgery, yet he postponed surgery to go on a snorkeling vacation. The reviewing court found that the record actually revealed that the plaintiff had postponed surgery due to uncertainty over whether workers' compensation would pay for the surgery. *Id.* Moreover, the plaintiff had tried to promote his recovery at home, as he continued his therapy doing various exercises. Additionally, there was no evidence supporting the pension board's assertion that the plaintiff cancelled surgery dates to go snorkeling. *Id.*

¶ 27 The reviewing court further noted that, after the pension board had determined that the plaintiff was not credible, it used this determination to discredit all of the medical opinions presented at the hearing that indicated that the plaintiff was disabled. The reviewing court found that this was improper. *Id.* at 143. The reviewing court explained that the pension board's doctors' medical opinions and diagnoses had been supported by the medical testing, *e.g.*, their physical examinations of the plaintiff and the results of the MRI. The reviewing court additionally noted the assumption that patients tell their doctors their true conditions and have no motive to falsify. *Id.* at 143-44 (citing *Greinke v. Chicago City Ry. Co.*, 234 Ill. 564, 570-71 (1908)). Furthermore, the reviewing court explained that, as it had already determined that the pension board's assessment of the plaintiff's credibility was against the manifest weight of the evidence, it was error for the pension board to discount the doctors' reports based on the plaintiff's purportedly suspect credibility. *Id.* at 144.

¶ 28 Finally, the reviewing court found that the pension board had mischaracterized some of the doctors' opinions to suggest that the plaintiff was no longer disabled. *Id.* As the reviewing court found that the pension board's decision was against the manifest weight of the evidence, it reversed the lower court's decision and remanded with directions that the pension board enter an order granting the plaintiff's application for line-of-duty benefits and any other relief to which he was entitled. *Id.* at 148-49.

¶ 29 We believe that, as in *Roszak*, the Board's decision here was against the manifest weight of the evidence because (1) it found that Lambert was not credible based on matters that were tangential at best to the issues that were before the Board, and (2) although the Board found "credible" the medical evidence that indicated Lambert was disabled, it then went on to discount all of the evidence based on its finding that Lambert was not credible. We address in turn each of the Board's findings as to Lambert's credibility.

¶ 30 First, the Board found that Lambert was not credible based on the physical position and

demeanor that he demonstrated at the hearing. Specifically, the Board found that Lambert's testimony regarding his level of pain was not credible based on his apparent ability to sit without pain. Lazzara also found that at the hearing Lambert was able to twist back and forth on his right knee without any problems (although Lambert strongly disputed that assessment, claiming that he was actually twisting back and forth on his uninjured left knee). We note that Lambert never testified that he could not sit. Rather, he repeatedly testified that he could not kneel, squat, crawl, climb a ladder, or carry heavy loads. Indeed, Lambert testified that, when playing with his children, he would sit rather than kneel or crawl. We note that in the August 2010 FCE there is a reference that Lambert was not able to sit for more than 30 minutes at any one time. There is no indication in the FCE, however, that Lambert self-reported that he could not sit or drive for a prolonged time. Instead, the FCE's finding that Lambert could sit only for a certain amount of time was based on the examiners' observations of what they believed he could do. We do not agree with the Board's apparent logic that, because he could sit better than the most recent FCE indicated that he could, he necessarily could do everything else (kneel, squat, crawl, climb, or carry) better to the point that he was not disabled. Moreover, even if Lambert was able to twist on his right knee, it did not mean that he could kneel, squat, crawl, climb, or carry heavy objects, all things that the medical examiners consistently said that he could not do.

¶ 31    Further, we note that at the hearing Lambert indicated that he agreed with the most recent FCE, particularly with its conclusion that he was not able to continue to work as a firefighter due to his disability. Lambert's agreement with the FCE is the only basis to say that his testimony regarding his ability to sit was inconsistent. We believe that this one small point in the record is insufficient to undermine the entirety of Lambert's testimony and all of the other evidence that indicated Lambert was disabled.

¶ 32    Second, the Board rejected Lambert's testimony that he could not work as a firefighter due to his knee pain because Lambert had testified that he could control his knee pain with Vicodin and ibuprofen. However, the record reveals that Lambert was not allowed to take Vicodin while he was working. Thus, whether Lambert was able to control his pain while he was not working was not relevant to the issue before the Board.[1]

¶ 33    Third, the Board found that the most recent FCE undermined Lambert's testimony that he could not manage his pain levels on the job. To support its finding, the Board took language from the August 2010 FCE out of context. The complete sentence upon which the Board partially relied states: "Further discussions regarding pain control could help him learn to manage his pain levels, *but at this time he is not ready to return to work full time*." (Emphasis added.) Thus, despite the Board's conclusion to the contrary, the most recent FCE

---

[1]We note that the dissent suggests that Lambert provided contradictory testimony regarding his use of Vicodin for pain control. At the March 16 hearing, Lambert testified that he was not taking Vicodin because his doctor wanted him to stop taking it in order to avoid addiction. At the September 7 hearing, Lambert testified that he would take up to eight Vicodin on some days in order to control his pain. We do not believe that Lambert's testimony is inconsistent. A reasonable inference from his testimony is that he attempted to stop taking Vicodin, but due to his continued pain, he had to keep taking it.

does not contradict Lambert's testimony.[2]

¶ 34 Fourth, the Board found that Lambert was not credible because of his failure to renew his paramedic certification. The limited number of extensions he sought to renew his certification arguably showed that he was not working toward improvement and reemployment. Even so, this evidence was minor in light of all the other evidence that indicated Lambert was unable to work as a firefighter/paramedic due to his disability.

¶ 35 Fifth, the Board found that a surveillance recording taken of Lambert doing various projects around his home undermined his credibility that he was disabled. We note that the surveillance DVD was not made part of the record. Ordinarily, the absence of such evidence in the record would be construed against the appellant, Lambert. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (explaining that any doubts that might arise from the incompleteness of the record will be resolved against the appellant). However, here it is not appropriate to construe the incomplete record against Lambert, because it was the Board's burden to make the DVD part of the record before the trial court if it wished to rely on it to support its findings. Specifically, section 3-108(b) of the Administrative Review Law (735 ILCS 5/3-108(b) (West 2010)) provides that it is the administrative agency's burden to present the court of review with the entire record of proceedings, including the evidence it considered. See also *Mueller v. Board of Fire & Police Commissioners*, 267 Ill. App. 3d 726, 733 (1994) (it is the administrative agency's duty to provide the trial court on administrative review with a sufficiently complete record of the proceedings so that the trial court can properly perform its judicial review function). As the Board did not introduce the DVD into the record at the trial court, the DVD did not become part of the record on appeal. Thus, the missing DVD should not be held against Lambert, who never had it in his control or possession.

¶ 36 Moreover, as it was the Board's obligation to submit the DVD, we cannot presume in its favor that whatever was on it was sufficient to support its credibility findings. This is particularly true since counsel for the Board represented at oral argument that "any part of the video that was relied on is in the transcript of the hearing before the Pension Board." See *People v. Banks*, 378 Ill. App. 3d 856, 865-66 (2007) (absence of videotape from record did not render record incomplete where videotape did not include any evidence not already appearing in the record). In its findings, the Board stated that the DVD showed Lambert "in his yard walking up steps and carrying household objects with little trouble, activities that he has simultaneously testified that he has too much pain to perform (*i.e.*, sitting, climbing, lifting and jostling)." The Board made no finding as to whether Lambert appeared to be in pain. We also note that the Board did not question Lambert whether he was on pain

---

[2]The dissent also asserts that the November 2009 FCE supports the Board's questioning of Lambert's credibility, because that report indicated that Lambert gave only 83% effort during the examination, which suggested that he was engaging "in mild self limiting behaviors." However, as Lambert submitted to four other FCEs and all of those indicated that he gave maximum effort, we believe that the November 2009 FCE, to the extent that it questions Lambert's effort, is an anomaly. We also note that the Board did not cite the November 2009 FCE as a reason to reject Lambert's credibility.

medication at the time the video was taken. Overall, we find that Lambert's testimony and what the Board observed on the DVD are not inconsistent. Lambert never testified that he could not walk up steps. He testified that he could not climb up a ladder. Lambert also did not testify that he could not carry household objects. He testified that he could not carry heavy objects, such as another person down a ladder, something he would be required to be able to do if he were to continue working as a firefighter. Accordingly, in the absence of the DVD, we cannot find the described actions to be inconsistent with Lambert's testimony or to otherwise undermine his credibility.

¶ 37        Finally, the Board found that Lambert's testimony that he had driven two hours to the hearing conflicted with his testimony that he could not sit for long periods of time or operate a department vehicle. Again, Lambert never testified that he could not sit. He also did not testify that he could not drive a vehicle. As noted above, there was a reference in the August 2010 FCE that Lambert could not sit for a long period of time. The FCE also indicated that Lambert could not drive a vehicle for a long period of time. Lambert agreed with the conclusions of the FCE. Even if we were to find that Lambert's testimony conflicted with these parts of the FCE, however, we believe that it is a small point in relation to the overwhelming evidence that Lambert could not kneel, squat, crawl, or use a ladder, actions that were necessary for him to do in order to work as a firefighter.

¶ 38        The Board used its finding that Lambert was not credible to discount all of the medical evidence that indicated that Lambert was not able to continue to work as a firefighter. As in *Roszak*, this determination was erroneous. See *Roszak*, 376 Ill. App. 3d at 144. The Board's doctors' medical opinions and diagnoses were supported by their physical examinations of Lambert. The doctors' observations and diagnoses themselves constituted objective evidence of Lambert's pain. See *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 466 (2009). Accordingly, the Board's decision to dismiss the objective findings of its appointed doctors was against the manifest weight of the evidence. *Roszak*, 376 Ill. App. 3d at 144.

¶ 39        The underlying premise of the dissent is that, once the Board made a determination as to Lambert's credibility, the Board successfully prevented this court from conducting any review of its decision. However, that is not the law of our state. See *id.* at 139; see also *People v. Drwal*, 27 Ill. 2d 184, 188-89 (1963) (a conviction that is based on the determination of the credibility of the witnesses will be set aside if necessary to prevent an apparent injustice). Indeed, such a law would be contrary to this court's overriding concern to ensure that justice be done. See *McCloud v. Rodriguez*, 304 Ill. App. 3d 652, 658 (1999) (court's duty is to ensure that justice is rendered to every party).

¶ 40        The dissent is also based on the false premise that, if there is any evidence in the record that supports the Board's decision, regardless of how minuscule, then the Board's decision must be affirmed. Although there is case law that would seemingly support the dissent's premise (see *Ellison*, 377 Ill. App. 3d at 440), a complete review of the applicable law reveals that an agency's decision will nonetheless be reversed if it is implausible (see *id.* at 440-41). Thus, contrary to the dissent's insistence, an agency's decision that is supported by some evidence, but is against the manifest weight of the evidence, cannot stand. See *Roszak*, 376 Ill. App. 3d at 144.

-11-

¶ 41     In determining that the Board's decision was against the manifest weight of the evidence, we find the Board's reliance on *People ex rel. Ulrich v. Board of Trustees of Firemen's Pension Fund*, 344 Ill. App. 210 (1951), to be improper. In *Ulrich*, this court issued only an abstract opinion, which cannot be relied upon as precedent. See *Schusse v. Pace Suburban Bus Division of the Regional Transportation Authority*, 334 Ill. App. 3d 960, 968 n.1 (2002). Further, we note that the Board cites no other Illinois case where a board's decision to reject the vast majority of the medical evidence and deny disability benefits has not been found to be against the manifest weight of the evidence. Our research reveals instead that, in such a situation, our courts have consistently reversed the board's decision. See *Kouzoukas*, 234 Ill. 2d at 467 (every medical professional who examined the plaintiff found that she suffered pain as a result of a lower back strain and that the pain, in turn, prevented the plaintiff from returning to work as a full-duty police officer); *Roszak*, 376 Ill. App. 3d at 135 (all three pension board-appointed physicians found that the plaintiff was disabled or incapable of performing his duties as a firefighter); *Bowlin v. Murphysboro Firefighters Pension Board of Trustees*, 368 Ill. App. 3d 205, 212 (2006) (pension board relied on only one doctor's opinion over the opinions of five others); *Thigpen v. Retirement Board of Firemen's Annuity & Benefit Fund*, 317 Ill. App. 3d 1010, 1014-16 (2000) (only physician selected by the board found that the plaintiff could not return to firefighting work); *Sullivan v. Retirement Board of Firemen's Annuity & Benefit Fund*, 267 Ill. App. 3d 965, 971 (1994) (one doctor who found the plaintiff was not disabled misstated evidence in reaching that conclusion); *Zien v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 236 Ill. App. 3d 499, 511 (1992) (all of the medical personnel who had evaluated the plaintiff's condition were in agreement that the plaintiff's disability was permanent and would prevent him from resuming his employment as a paramedic).

¶ 42     We also reject the Board's argument that Lambert is asking this court to consider additional evidence that was not considered by the Board. All of the evidence that Lambert asks us to consider was available for the Board's consideration. This evidence was relied upon by the Board-appointed doctors, all of whom determined that Lambert was not physically able to continue working as a firefighter. Lambert is essentially asking this court to consider the medical evidence to counter the Board's determination that he did not present any credible evidence as to his physical disability. However, as we have already determined that the Board's assessment of Lambert's credibility (and hence the credibility of the doctors who relied on the information that Lambert provided them) was against the manifest weight of the evidence, we need not dwell on the medical evidence further.

¶ 43     Finally, based on our resolution of Lambert's first contention on appeal, we need not consider his second contention, that the trial court erred in considering descriptions of the surveillance recording as demonstrative evidence.

¶ 44     For the foregoing reasons, the decisions of the circuit court of Du Page County and the Downers Grove Fire Department Pension Board are reversed and the case is remanded to the Board with directions to enter an order granting the application for a line-of-duty disability pension and any other relief to which Lambert is entitled.

¶ 45     Reversed and remanded.

¶ 46    JUSTICE McLAREN, dissenting.

¶ 47    Conspicuously absent from the majority's analysis of a case that rests almost exclusively on the issue of credibility is any standard of appellate review as regards credibility. Also missing from the majority opinion is any real analysis regarding the import of the missing DVD. The failure to properly address these issues results in a judgment from which I must dissent.

¶ 48                                                    CREDIBILITY

¶ 49    The Board, as the finder of fact responsible for overseeing testimony, makes credibility determinations and assigns weight to the testimony and other evidence; we do not weigh the evidence or substitute our judgment for that of the Board. See *Goodman v. Morton Grove Police Pension Board*, 2012 IL App (1st) 111480, ¶ 25. The trier of fact, by virtue of its ability to actually observe the conduct and demeanor of witnesses, is in the best position to make credibility determinations. See *In re Marriage of Berberet*, 2012 IL App (4th) 110749, ¶ 56. A credibility determination by a pension board will often be dispositive. *Mingus v. Board of Trustees of Police Pension Fund*, 2011 IL App (3d) 110098, ¶ 15. If the record contains evidence that supports an agency's decision, it should be affirmed. *Payne v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 2012 IL App (1st) 112435, ¶ 43.

¶ 50    The Board made specific findings as to credibility, and evidence in the record supports the Board's questioning of Lambert's credibility regarding his claimed level of pain and his inability to perform his job as a firefighter because of that pain. While most of the FCEs did not question Lambert's effort during the evaluations, the November 2009 FCE noted that Lambert's 83% consistency of effort/validity suggested that Lambert "presented with segmental inconsistencies during this evaluation resulting in mild self limiting behaviors." During the hearing, Board President Lazzara questioned Lambert about his "twisting back and forth on that right knee" while Lambert claimed that he could not kneel or crawl; though Lambert denied doing so, Lazzara said that he had seen it. Lambert also testified that he had driven two hours to attend the September hearing, while the most recent FCE noted that Lambert could sit comfortably for only about 30 minutes at a time.[3] In its findings, the Board also stated that its review of the surveillance DVD showed Lambert "walking up stairs and carrying household objects with little trouble, activities that he has simultaneously testified that he has too much pain to perform (*i.e.*, sitting, climbing, lifting and jostling)."

¶ 51    We cannot substitute our judgment for that of the Board regarding Lambert's credibility, nor can we ascribe weight to that lack of credibility any differently than did the Board. Yet

---

[3]Lambert argues that there were no questions addressing what type of vehicle he drove, whether he took breaks during the drive, and how long he drove at one sitting; thus, "the Board draws a conclusion unsupported by evidence based upon conjecture and speculation that he drove for two (2) hours non-stop." However, such questions could have been asked by Lambert's counsel, or Lambert could have provided such answers on his own when he was asked by the Board about the drive. The conclusion that Lambert drove for two straight hours is not unsupported by Lambert's statement that he had driven almost two hours to get to the hearing that day.

the majority does just that, tossing in some factual inaccuracies along the way, in order to reverse the Board's decision. The majority believes that the matters upon which the Board found that Lambert lacked credibility were "tangential at best to the issues that were before the Board"[4] and that the Board "went on to discount all of the evidence based on its finding that Lambert was not credible." *Supra* ¶ 29. To the Board's finding that it "witnessed the physical position and demeanor of Firefighter Lambert throughout the two public hearings, finding his testimony regarding his level of pain not credible," the majority counters:

> "We do not agree with the Board's apparent logic that, because he could sit better than the most recent FCE indicated that he could, he necessarily could do everything else (kneel, squat, crawl, climb, or carry) better to the point that he was not disabled. Moreover, even if Lambert was able to twist on his right knee, it did not mean that he could kneel, squat, crawl, climb, or carry heavy objects, all things that the medical examiners consistently said that he could not do." *Supra* ¶ 30.

¶ 52   Lambert's testimony that he had taken Vicodin but was weaned off the medication to prevent addiction (March 16) and that on some days he would take up to eight Vicodin (September 7) are found not to be "inconsistent"; the majority finds that a "reasonable inference from his testimony is that he attempted to stop taking Vicodin, but due to his continued pain, he had to keep taking it." *Supra* ¶ 32 n.1. Evidence in the November 2009 FCE that Lambert gave only 83% effort is discounted by the majority, "to the extent that it questions Lambert's effort," as "an anomaly." *Supra* ¶ 32 n.2. The Board found that Lambert was "stuck in traffic for more than an hour, yet claimed an inability to sit long periods of time"; the majority depreciates this by stating that the FCE finding that noted Lambert's inability to sit for more than 30 minutes "was based on the examiners' observations of what they believed he could do" and that "[t]here is no indication in the FCE, however, that Lambert self-reported that he could not sit or drive for a prolonged time." *Supra* ¶ 30. Lambert's agreement with the findings contained in the FCE, including the inability to sit for more than 30 minutes, is "one small point," according to the majority. *Supra* ¶ 31. The majority chastises the Board for "partially" relying on language from the August 2010 FCE, regarding Lambert learning to manage pain, that was allegedly taken "out of context" (*supra* ¶ 33) but fails to acknowledge the other evidence upon which the Board "partially" relied for this finding. Evidence that Lambert did not renew his paramedic certification is termed "minor." *Supra* ¶ 34. While noting that Lambert had testified that walking on stairs was "difficult and painful" (*supra* ¶ 7), the majority dismisses the Board's finding that the DVD showed Lambert " 'walking up steps *** with little trouble, *** [which] he has simultaneously testified that he has too much pain to perform' " (*supra* ¶ 20), by noting that

---

[4]The majority obtained the phrase "tangential at best" from *Roszak*, where the court addressed the board's findings regarding the claimant's credibility arising from "questions about where he lived, where he worked, what he earned, and his current net worth." *Roszak*, 376 Ill. App. 3d at 140. The Board here questioned Lambert's credibility regarding his level of pain and inability to perform his job, based on his testimony and his physical position and demeanor during the hearing. These are hardly the "tangential" issues addressed in *Roszak*, and the application of that phrase to this case is inappropriate and inaccurate.

-14-

the Board "made no finding as to whether Lambert appeared to be in pain" and "did not question Lambert whether he was on pain medication at the time the surveillance video was taken." *Supra* ¶ 36. Every Board finding is weighed; every conclusion is dissected; every basis that supports the Board's decision is minimized. What is any of this other than a naked attempt to discount evidence that supports the Board's decision, reweigh the evidence, and substitute the majority's judgment for that of the Board?

¶ 53    The majority's reweighing of the evidence is also peppered with inaccuracies regarding the evidence actually in the record with the injection of its own realities. The majority states: "Specifically, the Board found that Lambert's testimony regarding his level of pain was not credible based on his apparent ability to sit without pain." *Supra* ¶ 30. However, Board finding No. 34 states that the finding that Lambert's testimony regarding his level of pain was not credible was based on Lambert's "physical position and demeanor *** throughout the two public hearings." No mention of Lambert's sitting is made until finding No. 39, which deals with Lambert's "being stuck in traffic for more than one hour" in his SUV despite a claimed "inability to sit long periods of time or operate/drive department vehicles." The majority also brings up Lazzara's conversation with Lambert regarding the twisting of his knee in the supposed context of his not being able to sit ("We note that Lambert never testified that he could not sit." *Supra* ¶ 30). However, I note that Lazzara did not raise this question in the context of Lambert's ability to sit: " '[BOARD] PRESIDENT LAZZARA: Help me with this one, because you just said you can't kneel, you can't crawl, but yet you have been sitting in that chair twisting back and forth on that right knee. Help me.' " *Supra* ¶ 17.

¶ 54                              MISSING DVD

¶ 55    Lambert provided this court with a record that failed to include the DVD of surveillance video taken on August 24, 2010. The majority similarly fails to provide a logical analysis of the implications of the missing DVD. The *appellant* bears the burden of presenting a sufficiently complete record. *In re Marriage of Holtorf*, 397 Ill. App. 3d 805, 811 (2010). While acknowledging that any doubts arising from the incompleteness of the record is to be resolved against the appellant (*supra* ¶ 35), the majority proceeds not only to fail to resolve doubts from the incompleteness of the record against Lambert but to resolve such doubts against the Board, the *appellee*. Because the majority fails to properly apply these basic tenets of appellate review, the majority's discussion of the DVD evidence crumbles.

¶ 56    The majority is correct that it was the Board's burden to present the court of review with the entire record of proceedings, including the evidence it considered. See *supra* ¶ 35. However, I must point out certain flaws in the majority's description of the Board's burden. The burden to include the DVD in the record existed not only, as the majority states, "if it [(the Board)] wished to rely on it to support its findings." *Supra* ¶ 35. An administrative agency does not get to pick and choose which evidence to include; can it leave out portions of the record that it wishes to ignore? Further, the Board was not required to "introduce the DVD into the record at the trial court." *Supra* ¶ 35. The DVD was introduced into evidence at the administrative hearing. The Board was required to include the DVD as part of "the entire record of proceedings under review, including such evidence as may have been heard

-15-

by it and the findings and decisions made by it." 735 ILCS 5/3-108 (West 2010).

¶ 57 The majority continues that, since the DVD did not become part of the record on appeal, "the missing DVD should not be held against Lambert, who never had it in his control or possession." *Supra* ¶ 35. However, Lambert forfeited the issue of the missing DVD at the administrative review in the trial court. Lambert filed (and the trial court granted) an agreed motion to amend the administrative record, in which he sought to include in the record two missing pages of medical reports (one of which "has not been located"); the "addition of these pages will give the Court a *full and complete record*." (Emphasis added.) Thus, not only did Lambert not object in the trial court that the record was incomplete without the DVD; when he was granted the opportunity to amend the record with evidence that had been left out, he chose not to seek the inclusion of the DVD. According to Lambert, the record was "full and complete" even in the absence of the DVD. Apparently, the absence of the DVD did not prevent the trial court from considering the full and complete record of the administrative hearing, as Lambert addressed the alleged contents of the DVD in his written briefs and his oral arguments to the trial court.[5]

¶ 58 The Board was obligated to provide to *the trial court* the entire record of proceedings under review. It failed to do so. Lambert was obligated to object in the trial court to an incomplete record; however, he and the Board agreed that the inclusion of missing pages created a full and complete record for the trial court. Issues not raised in the trial court are deemed forfeited and may not be raised for the first time on appeal. *Martinez v. River Park Place, LLC*, 2012 IL App (1st) 111478, ¶ 29. Lambert was obligated, as appellant, to present *this court* with an adequate record on appeal. *Holtorf*, 397 Ill. App. 3d at 811. He failed to do so. Under long-established precedent (*Foutch* was decided in 1984), this court should resolve any doubts arising from the incompleteness of the record against Lambert. The majority has failed to do so.

¶ 59 The majority cryptically asserts that it cannot presume in the Board's favor that whatever was on the DVD was "sufficient to support its credibility findings,"[6] particularly because "counsel for the Board represented at oral argument that 'any part of the video that was relied on *is in the transcript of the hearing before the Pension Board*.' " (Emphasis added.) *Supra* ¶ 36. The majority attempts to support this conclusion by citing to *Banks*, 378 Ill. App. 3d at 865-66, for the proposition that the "absence of videotape from record did not render record incomplete where videotape did not include any *evidence not already appearing in the record*." (Emphasis added.) *Supra* ¶ 36. However, the majority then fails to cite to any description of the contents of the DVD contained in the transcript of the hearing before the Board or to any other evidence regarding those contents. This is understandable, as there was no transcript from the hearing before the Board or any other evidence regarding what was

---

[5]According to counsel, Lambert was shown "riding around on a sitting lawn mower holding his kid and occasionally doing a little walking."

[6]I must also point out that "whatever was on the DVD" was not the only evidence that the Board relied on in making its credibility findings; thus, the contents of the DVD need not be "sufficient," on their own, to support the Board's credibility findings.

shown on the DVD. Instead, the majority quotes from the *Board's finding* (No. 38) regarding the DVD's contents. See *supra* ¶ 36 ("In its *findings*, the Board stated that the DVD showed Lambert 'in his yard walking up steps and carrying household objects with little trouble, activities that he has simultaneously testified that he has too much pain to perform (*i.e.*, sitting, climbing, lifting and jostling.' "). (Emphasis added.) The majority does not explain how or why it can equate alleged on-the-record testimony or other evidence regarding the DVD contents with the Board's later finding; it merely makes the leap. In essence, the majority attempts to discredit the Board's *finding* regarding the surveillance DVD with the Board's *finding* regarding the surveillance DVD.

¶ 60    Further, the majority's reliance on *Banks* is misguided and flawed. The defendant in *Banks* argued that the loss of the videotape of his traffic stop "alone, with no other showing, renders the record incomplete for meaningful review on appeal and entitles him to a new trial." *Banks*, 378 Ill. App. 3d at 865. This court disagreed, finding that the defendant had not sustained his burden of demonstrating that he was not at fault for failing to preserve the tape and that the tape was material to his contentions on appeal. *Id.* at 870. We found that the defendant failed to "articulate what the videotape would show" and failed "to suggest that the videotape was exculpatory or contradictory of any other evidence presented at trial" such that he failed to demonstrate a colorable need for the videotape. *Id.* at 866. Therefore, we addressed the issues on appeal and *affirmed* the trial court. Here, Lambert does not argue that the missing DVD prevents this court from giving a meaningful review on appeal, and apparently the majority agrees. In fact, the majority not only analyzes the content of the DVD without the benefit of actually seeing the DVD or any other actual evidence of what the DVD shows, but actually draws from the nonexistent evidence inferences *in favor* of Lambert (who failed to sustain his burden of providing a complete record on appeal) on the issue of *credibility* in order to *reverse* the decision below. The majority corrupts the long-standing and well-established rule from *Foutch* and stands the rule on its head; instead of presuming support for the judgment due to an incomplete record, the majority does exactly the opposite. Further, the majority goes further than even the defendant in *Banks*, who argued that the remedy for the missing videotape was a new trial, not a finding of not guilty. Here, the majority does not merely vacate the trial court's judgment and remand the case so that a sufficient record might be assembled and actually reviewed in the trial court; instead, it outright reverses the Board's decision and orders the granting of Lambert's application for a line-of-duty disability pension.

¶ 61    Lambert complains in his brief that the trial court "never actually viewed the video, but ruled it a valid basis for the Board's decision." The majority here commits the same error of using nonexistent "evidence" to support its ruling but compounds the error by using it to *reverse* the decision below. Lest we forget, it is not the function of this court to scour the record to find a reason for reversal. *In re G.W.*, 357 Ill. App. 3d 1058, 1061 (2005). It is even less so the function of this court to search *outside* the record for a reason to reverse.

¶ 62    Journalist Ron Suskind quoted an unnamed aide to President George W. Bush as saying, " 'when we act, we create our own reality.' " Ron Suskind, *Faith, Certainty and the Presidency of George W. Bush*, N.Y. Times Magazine (Oct. 17, 2004). The majority here creates no less.