# Illinois Official Reports

## Appellate Court

---

### *Edwards v. Addison Fire Protection District Firefighters' Pension Fund*, 2013 IL App (2d) 121262

---

| | |
|---|---|
| Appellate Court Caption | KIM L. EDWARDS, Plaintiff-Appellant, v. THE ADDISON FIRE PROTECTION DISTRICT FIREFIGHTERS' PENSION FUND, THE BOARD OF TRUSTEES OF THE ADDISON FIRE PROTECTION DISTRICT FIREFIGHTERS' PENSION FUND, and THE ADDISON FIRE PROTECTION DISTRICT, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-12-1262 |
| Filed | December 9, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The finding of defendant board of trustees of the pension fund of the fire protection district where plaintiff was employed that plaintiff failed to prove that she had incurred a "sickness" from an allergy to latex that rendered her "permanently disabled" within the meaning of the Pension Code and that she was not entitled to a line-of-duty disability pension was not against the manifest weight of the evidence and was upheld by the appellate court, and further, the trial court's denial of her motion to consolidate the administrative review of the Pension Board's decision with her pending employment discrimination action claim arising from the termination of her employment was also upheld, since the two actions involved different roles for the trial court, different standards, different issues, and different evidence. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 12-MR-162; the Hon. Bonnie M. Wheaton, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Thomas W. Duda, of Law Offices of Thomas W. Duda, of Arlington Heights, for appellant. |
| | Richard J. Reimer, Keith A. Karlson, and Christopher M. Melnyczenko, all of Reimer & Karlson LLC, of Hinsdale, for appellee Addison Fire Protection District Firefighters' Pension Fund. |
| | Ericka J. Thomas, of Ottosen Britz Kelly Cooper Gilbert & DiNolfo, Ltd., of Naperville, for appellee Addison Fire Protection District. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion. |
| | Justices Schostok and Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1      Plaintiff, Kim L. Edwards, appeals from the trial court's orders: (1) denying her motion to consolidate this case with another pending case, before a single judge; and (2) denying her complaint for administrative review and affirming the decision of defendant the Board of Trustees of the Addison Fire Protection District Firefighters' Pension Fund (Board). We affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Edwards was employed as a firefighter/paramedic for defendant the Addison Fire Protection District (District). In July 2008, Edwards sent a memorandum to Captain Roy Charvat, in which she reported the "increasing severity" of reactions that she had been having to the latex gloves that were carried on the District's fire apparatuses; in light of these reactions, she recommended that the District move to the use of nonlatex nitrile gloves, which she wore, for all duty personnel. Lieutenant Mike Toika, to whom Edwards had previously spoken about her increasing latex reactions, investigated the equipment in the District's ambulances to identify the items that contained latex. In a memorandum to Charvat, Toika explained:

- 2 -

"The biggest issue, at this time, is the gloves. The sensitivity issue with Kim is increasing, and while benedryl [*sic*] does help, she really doesn't want to be using it that much here. So any help you can give, in at least getting [the] department to purchase nitrile gloves only would be greatly appreciated."

¶ 4       Edwards continued working her scheduled shifts until September 11, 2008, when she received a telephone call from Leigh Fabbri, the District's fire chief, who informed her that she could not return to work until the latex situation had been resolved. The District then sent Edwards for three independent medical evaluations concerning her latex allergy. The evaluations were performed in September, October, and December 2008.

¶ 5       On October 16, 2008, Edwards filed with the Illinois Department of Human Rights a charge of discrimination against the District. Edwards alleged that she had a physical disability as defined in section 1-103(I) of the Illinois Human Rights Act (Act) (775 ILCS 5/1-103(I) (West 2008)), that the District was aware of her disability, and that the disability was unrelated to her ability to perform the essential functions of her job "with or without a reasonable accommodation."

¶ 6       In a letter dated December 16, 2008, Chief Fabbri notified Edwards that the District had "no option but to seek your termination." According to Fabbri, the reports from the independent medical evaluations "have made it clear that any exposure to latex constitutes a risk to the well-being of people under your care, your well-being, and other responders who may need to be re-directed to intervene to counteract a reaction you may experience." The opinion of the doctors involved was that Edwards "cannot return to duty as a firefighter/paramedic." The District considered whether any positions that could ensure no contact were available, but it had "no such openings at this time." Fabbri relayed that the District would file charges with the board of fire commissioners, which would hold a hearing. However, the District was "open to discussing alternate methods" of Edwards' separation from the District, including "application for a disability pension or resignation." No charges were filed with the board of fire commissioners.

¶ 7       In January 2009, Edwards filed with defendant the Addison Fire Protection District Firefighters' Pension Fund (Fund) an application for disability pension benefits, claiming a line-of-duty disability pursuant to section 4-110 of the Illinois Pension Code (Code) (40 ILCS 5/4-110 (West 2008)).[1] In her application, Edwards described her disability as "Latex allergy worsening over the past two years due to exposure at Addison Fire Dept." She also described the cause of her illness as "Repeated exposure to latex through the latex gloves that were being used on the AFD's ambulances/engines." Hearings on Edwards' application were held in November 2009 and September 2011 before the Board. On January 3, 2012, the Board issued a 27-page decision and order in which it found that Edwards had failed to prove "that she incurred a 'sickness' that rendered her 'permanently disabled' within the meaning of the Pension Code." Thus, the Board concluded that Edwards was not entitled to a "line of duty" disability pension and, therefore, denied her claim.

_____

[1]Edwards was not eligible for a "not in duty" pension, as she did not have at least seven years of creditable service when she filed. See 40 ILCS 5/4-111 (West 2008).

¶ 8        On February 3, 2012, Edwards filed a complaint for administrative review, praying for the trial court to reverse the Board's decision and order the Board to pay her line-of-duty benefits. In March, Edwards filed a motion for consolidation, seeking to consolidate the administrative review case and a civil cause of action, pending before another judge in Du Page County, that arose from Edwards' discrimination claim before the Department of Human Rights. The trial court denied the motion. Following briefing and arguments, the trial court concluded that the Board's decision to deny benefits was "not against the manifest weight of the evidence and was not clearly erroneous." Therefore, the trial court affirmed the Board's decision and denied Edwards' complaint for administrative review. This appeal followed.

¶ 9                                  II. EVIDENCE

¶ 10       Edwards testified before the Board that she was told by her family physician in 1999 that latex "may be the cause" of the rashes that she experienced after wearing Band-Aids. She did not undergo any testing until she was given a preemployment health screening in 2000 at Northwest Community Hospital. A radioallergosorbent (RAST) blood test confirmed her allergy. She then worked as a patient-care technician in the pediatric emergency room at Northwest Community, which was latex-free, and experienced no allergy problems. She later worked as a firefighter/paramedic for the Village of Hanover Park and, concurrently for a period, for a private ambulance service. Both employers were made aware of her latex allergy, and both provided her with nonlatex nitrile gloves. However, coworkers were not required to wear nonlatex gloves. She did not miss any time from work at either employer because of her allergy.

¶ 11       Edwards began her employment with the District in July 2004. Her duties with the District included emergency medical care and response to 911 calls as well as fire suppression duties. She advised the District of her allergy at that time, but "[i]t was not discussed any further." The District provided her with nitrile gloves, but most of her coworkers wore latex gloves, and all of the District's vehicles and apparatuses carried latex gloves. She had no problems with her allergy until May or June 2008, when she began having both increased contact reactions, in the form of hives, and respiratory reactions, which she had never before experienced, after contact with latex. After she brought this to the attention of Toika and Charvat in July 2008, she heard nothing more until September 11, 2008, when Fabbri notified her that she was not allowed to return to work. Until that date, she did not miss any time from work because of her allergy. She scheduled an appointment with Dr. Priya Bansal, an allergist who had been treating her, and brought up the issue of latex for the first time. She had not experienced any more allergy symptoms since she stopped working, other than when a nurse wearing latex gloves gave her infant child a shot; Edwards suffered hives on her neck shortly thereafter.

¶ 12       Edwards testified that she had been prescribed medications for her multiple allergies; while they all contained warnings regarding drowsiness, she did not experience such a side effect other than when she took Benadryl, which she took on "extreme days" but not as part of her regimen.

¶ 13    The Board received into evidence without objection the reports from the three independent medical evaluations that the District required in 2008. Dr. James Ebert, the District's physician, examined Edwards on September 17, 2008, and ordered allergy testing, which was performed by Bansal. After reviewing the results of these tests and the notes of another independent medical evaluator, Dr. Jeffrey Coe, Ebert noted Edwards' preexisting latex allergy and the increasing severity and frequency of her reactions in the past seven to eight months. He characterized her condition as "progressive and requiring complex multi-drug regimens for potential adequate control." However, use of some of these drugs "may not be possible when performing the essential duties of a paramedic/firefighter," as they could cause sedation and other side effects that could "adversely affect decision making capabilities and other performance." He also described Edwards' condition as "not currently stable or entirely defined as to the causative allergic agent(s) in the workplace." Ebert concluded that Edwards' "current functioning as a paramedic/firefighter would create a potentially unsafe work condition for her and is not recommended." In her testimony, Edwards stated that she felt that Ebert was "unqualified"and that she disagreed with his recommendation that she not continue working. If she could "try any type of modifications" or if the District "was willing to do any type of modifications," then she "would be able to at least attempt to work and continue to work."

¶ 14    Coe, an occupational-medicine doctor, examined Edwards in October 2008. In his October 10 report, Coe noted Edwards' "well established latex allergy" and that she was "asymptomatic" since being away from the workplace for about a month. Edwards had told him that, in recent years, she had occasionally experienced skin irritation and hives when she touched latex gloves but that she could control the skin reaction with antihistamine medication prescribed by her allergist. She also told him that she had "not clearly experienced episodes of shortness of breath in association with latex contact"; she related any such shortness of breath issues to "exertion or nonlatex allergies." Edwards also said that she took prescribed antihistamine medications regularly but "rarely" used prescribed bronchodilating medications. Based on Coe's examination, his review of Edwards' medical records, and Edwards' "recognition of the nature of her latex allergy," Coe opined that Edwards "continues to be able to work as a paramedic/firefighter" for the District. He recommended that she continue to be treated by her allergist and that she contact her allergist and her supervisor "immediately to report any changes in her symptoms." Edwards testified that she was "thrilled that [Coe] was able to give information which appeared to be different from Dr. Ebert's" and said that she believed "that there were small changes that would need to be made to the fire department apparatus that would allow" her to work.

¶ 15    Dr. Terrence Moisan reported in December 2008 that Edwards had "well-documented allergic reactions to latex antigens," including "not only local but diffuse, cutaneous, and airway symptoms." The picture of Edwards' "increasing latex sensitivity is clear," and Edwards was admonished "to avoid any known latex-containing products or airborne exposure where glove powder may contaminate the breathing zone with latex particles." Edwards "clearly is not able to function in a number of settings where latex is *potentially* encountered" (emphasis in original) and should not return to her employment. Mosian did not

expect a "fundamental improvement," given Edwards' symptoms, and he noted that "[p]retreatment with antihistamines is *not* an acceptable form of protection in this setting." (Emphasis in original.)

¶ 16 Pursuant to section 4-112 of the Code (40 ILCS 5/4-112 (West 2008)), the Board also sent Edwards to be examined by three independent physicians. Dr. Paul Detjen, a doctor of adult and pediatric asthma and allergy who was board certified in allergy and immunology, reported in May 2009 that, while Edwards' history was consistent with a diagnosis of a latex allergy, a RAST blood test performed on May 5, 2009, was negative. Detjen noted that "[n]either the history nor skin test nor blood test are 100% sensitive or specific for the diagnosis." However, the RAST blood test "puts some degree of doubt into the diagnosis of a latex allergy." He recommended a repeat test and said that Edwards' ability to return to work would "hinge on the accuracy of the diagnosis and will be subject to the results" of the retest.

¶ 17 In a report dated March 20, 2011, Detjen presented an addendum to his earlier evaluation. In March 2011, he had performed a series of tests on Edwards, including a T.R.U.E. TEST patch (testing for "delayed-type reactivity to latex or products involved in the production of latex gloves"), latex skin-prick testing, a latex "use" test (which included Edwards wearing latex gloves for half an hour and gently rubbing her eyes), and a repeat latex RAST blood test. The results of the tests were negative, with the exception of the "use" test, which resulted in some eye irritation that lasted for several hours and "resolved slowly." Detjen found no conclusive proof of measurable allergy to latex. While Edwards' "story [was] consistent with some degree of immediate type reactivity to latex," Detjen had "no independent definitive proof that either immediate IgE or delayed latex immunicological reactivity exists." Edwards' reaction "that occurred in the office could be consistent with a non-immunological irritation reaction." In addition, Edwards had not been able to provide him with the results of her 2000 RAST blood test that originally confirmed her latex allergy. Denton reported that the diagnosis of a latex allergy "is in serious doubt" and that "the extent and duration of disability hinge on a definitive diagnosis of latex allergy which I am currently unable to confirm." Detjen expressed his "hope and expectation that Ms. Edwards would be able to return to a work environment that involves some degree of latex exposure, which continues to be her reported preference, without risk of anaphylaxis."

¶ 18 Dr. James Pollock reported in May 2009 that he examined Edwards and also reviewed the reports of Ebert, Bansal, Coe, and Moisan. Pollock stated that "no one is questioning her reaction to latex, which appears to have worsened with continued exposure." He believed that Edwards' repeated exposure to latex in her employment "converted what was a mild reaction into a more severe reaction" and that her sensitivity was "a permanent disability." She could "perform any duties that do not include exposure to latex," but there was "no satisfactory 'desensitization' protocol available to enable her to return to full and unrestricted firefighter duties."

¶ 19 In an addendum dated July 9, 2009, Pollock responded to a question posed by Board member Richard Reimer as to whether his opinion was altered by "the negative RAST-Latex test." Pollock responded, "The immunoassay test is negative in 50% of the latex intolerant

patients and therefore this result does not surprise me. I believe she is latex sensitive. SUGGESTION: repeat the challenge/test."

¶ 20    Dr. Peter Orris reported in September 2009 that he had examined Edwards and reviewed the reports of Ebert, Bansal, Coe, Moisan, and four other doctors. He concluded that Edwards' allergic sensitivity to latex had become more severe "in part due to her continued exposure to latex on her job." This sensitization "now disables her from further work in an environment with latex exposure." Her current exacerbation "may well be permanent," and she should not return to firefighting. Her "disablement is probably permanent and should be considered an occupationally related worsening of her allergies." It was "unlikely" that a return to this work environment would be possible.

¶ 21    Bansal, who was board certified in allergy and immunology, testified before the Board on September 28, 2011. Edwards had begun treatment at her office in 2003, but Bansal first saw her in April 2005. (A copy of a report dated December 8, 2003, from her partner, Dr. Greg Sharon, noted that Edwards had "high to severe" allergies to ragweed, cats, mites, and house dust and that she had a positive RAST test to shellfish. Edwards was also advised to avoid latex, although there is no indication that any latex testing was done.) It was not until 2008 that she treated Edwards for a latex allergy. On September 22, 2008, Bansal performed a standard skin-prick test and a latex challenge test with a latex glove. Edwards "was positive" on the skin test and, "within 15 minutes of placing the Latex on her skin, she developed a runny nose, coughing, itchy skin, and redness and hives on the hand that had the Latex glove on." Within a few hours after being discharged from the testing in stable condition, Edwards called Bansal to report that, while she had no trouble breathing or swallowing, she had broken out in hives. Bansal sent these results to Ebert. A later blood test produced a negative result. Bansal told Edwards that "usually you don't need one test to go over the other test. So if one is positive, she did not need to have the other one. But I told her if her job needed it, I would order it." She made a general recommendation that Edwards avoid latex. "However, with her, the main complaint was with the gloves, and, thus, I had advised her that on the ambulance rig where she was experiencing the most symptoms that the Latex gloves be removed from the ambulance rig." Bansal opined, within a reasonable degree of medical certainty, that Edwards was allergic to latex.

¶ 22    Bansal also testified that she saw Edwards twice in 2009, after Edwards had applied for the pension. Since she had stopped working in September 2008, Edwards' other allergy symptoms (her allergies to mites, mold, dust, and cats) "were doing exceptionally well" and she had been able to reduce her usage of allergy medications. In Bansal's opinion, once Edwards "was avoiding her highly allergenic trigger, which in her case was the Latex, her symptoms improved."

¶ 23    Bansal had reviewed Detjen's 2009 and 2011 reports but opined that Edwards still suffered from a latex allergy. According to Bansal, "when a person is continuously exposed to their allergens, their likelihood of their testing being more severe is increased." Edwards' "threshold to have a reaction was very low" when she was continuously exposed to latex. However, when Edwards was tested in 2011, she had been away from latex exposure for almost 2½ years, and her latex allergy "may not have been picked up on that testing." In

addition, latex testing was "well-known to have a negative predictive value of 15 to 20 percent." While Bansal agreed that an accurate result was more likely where more tests provide the same result, even if all tests give a negative result, it would still be only "about 80% accurate." Because of this, Detjen "even in his conclusion summary couldn't write that she does not have a Latex allergy because of that false negative rate that you can miss 20 percent of people even if you test them."

¶ 24    Bansal had recommended that all District employees cease using latex gloves; without that change, which was not implemented, Edwards could not continue working for the District. Edwards "would be fine again initially" if she returned to work; however, "after time," probably within six months, her symptoms would return. With the change, Edwards "might be able to work there again." In Bansal's opinion, Edwards "is permanently disabled if the work conditions remain the same." However, she would not be disabled "if the work conditions change."

¶ 25    Included in the record was National Institute for Occupational Safety & Health, Pub. No. 97-135, *NIOSH Alert: Preventing Allergic Reactions to Natural Rubber Latex in the Workplace* (1997). Among other things, this publication noted that a diagnosis of latex allergy "is made by using the results of a medical history, physical examination, and tests." Sometimes, "tests may fail to confirm a worker who has a true allergy to latex, or tests may suggest latex allergy in a worker with no clinical symptoms. Therefore, test results must be evaluated by a knowledgeable physician." *Id.* at 5. Complete latex avoidance, "though quite difficult," is the most effective approach to treating a latex allergy. *Id.*

¶ 26    The record also included filings from Edwards' discrimination case before the Department of Human Rights. Edwards alleged that she had a physical disability as defined in the Act and that the District was aware of the disability. However, she also alleged that her physical disability "is unrelated to my ability to perform the essential functions of my job with or without a reasonable accommodation."

¶ 27                              III. THE BOARD'S DECISION

¶ 28    The Board found that Edwards had not "proved that she incurred a 'sickness' that rendered her 'permanently disabled' within the meaning of the Pension Code." While Edwards had testified that she experienced "certain reactions when she is exposed to Latex," the Board found "that the evidence does not support [Edwards'] claim that her reactions to Latex constitute a 'sickness' that have [*sic*] rendered her 'permanently disabled' such that she must be placed on a disability pension." While Edwards may have a sensitivity to latex exposure, "this sensitivity is not severe enough to constitute a disabling sickness" under the Code, "because it never precluded [Edwards] from performing full and unrestricted firefighting duties." In addition, such sensitivity "did not last for a continuous period of not less than 12 months" and Edwards did not prove "that she would suffer disabling symptoms that could be expected to last for a continuous period of not less than 12 months."

¶ 29    The Board placed "significant weight" on the test results from Detjen and the opinions of both Detjen and Dr. Coe (who opined that Edwards "continues to be able to work as a

paramedic/firefighter for the District"). The Board accorded less weight to the opinions of Moisan, Pollock, and Orris because they "did not perform any confirmatory testing." Therefore, the Board concluded that Edwards was "not entitled to a 'line of duty' disability pension."

¶ 30                                    IV. ANALYSIS

¶ 31         In an appeal from the decision of an administrative agency, we review the agency's determination, not that of the trial court. *Szewczyk v. Board of Fire & Police Commissioners*, 2011 IL App (2d) 100321, ¶ 20. We review *de novo*, as a question of law, an agency's interpretation of a statute or an administrative rule. *Id*. The agency's factual determinations are held to be *prima facie* true and correct, and we will uphold those determinations unless they are against the manifest weight of the evidence. *Goodman v. Morton Grove Police Pension Board*, 2012 IL App (1st) 111480, ¶ 24. A factual finding is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Szewczyk*, 2011 IL App (2d) 100321, ¶ 20. Where the question is whether the evidence of record supports the agency's denial of a plaintiff's application for a disability pension, the manifest weight standard of review applies. *Kouzoukas v. Retirement Board of Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 464 (2009). Finally, we apply the "clearly erroneous" standard to mixed questions of law and fact. *Id*. An agency's decision is clearly erroneous when the reviewing court is left with the definite and firm conviction that the agency has made a mistake. *Id*. This standard provides some deference based on the agency's experience and expertise and falls between the *de novo* and manifest weight standards of review. *Szewczyk*, 2011 IL App (2d) 100321, ¶ 20. Where the agency questions whether the plaintiff is disabled within the meaning of the Code and requires us to interpret the meaning of the Code provision, it is a mixed question of law and fact, subject to the "clearly erroneous" standard. *Kouzoukas*, 234 Ill. 2d at 464. If there is evidence of record that supports the agency's determination, it must be affirmed. *Goodman*, 2012 IL App (1st) 111480, ¶ 25.

¶ 32         The elements that must be proved in order to establish a firefighter's entitlement to line-of-duty disability benefits are: (1) the claimant is a firefighter; (2) a sickness, accident, or injury was incurred; (3) such sickness, accident, or injury was incurred in or resulted from the performance of an act of duty or from the cumulative effects of acts of duty; (4) the firefighter is mentally or physically disabled for service in the fire department; and (5) the disability renders necessary the firefighter's being placed on a disability pension. 40 ILCS 5/4-110 (West 2008). There is no requirement that an act of duty be the sole or even the primary cause of the applicant's disability; it is sufficient that an act of duty was an aggravating, contributing, or exacerbating factor. *Village of Oak Park v. Village of Oak Park Firefighters Pension Board*, 362 Ill. App. 3d 357, 371 (2005). A permanent disability is defined as "any physical or mental disability that (1) can be expected to result in death, (2) has lasted for a continuous period of not less than 12 months, or (3) can be expected to last for a continuous period of not less than 12 months." 40 ILCS 5/4-105b (West 2008).

¶ 33         We conclude that the Board's decision was not against the manifest weight of the evidence. The Board found that Edwards' own testimony and discussions with the examining

- 9 -

doctors demonstrated the lack of severity, and nondisabling nature, of her reaction to latex. Edwards did not discuss such an allergy with any of her treating physicians between December 2003 and September 2008, never noticed any problems with it until July 2008, and never missed any work because of it until the District removed her from duty. According to Coe's October 10, 2008, report, Edwards did not attribute any respiratory symptoms to a latex allergy but related any shortness of breath issues to "exertion or nonlatex allergies." The Board also noted Edwards' filing before the Department of Human Rights in which Edwards alleged that her disability was unrelated to her ability to perform the essential functions of her job, "with or without a reasonable accommodation." Edwards fails to address any of these findings and issues.

¶ 34    Instead, Edwards' first argument appears to be little more than an attempt to reweigh the evidence. The Board, as the finder of fact, makes credibility determinations and assigns weight to testimony and other evidence; we do not weigh the evidence or substitute our judgment for that of the Board. *Lambert v. Downers Grove Fire Department Pension Board*, 2013 IL App (2d) 110824, ¶ 49 (McLaren, J., dissenting). The Board found that the opinions of Coe and Detjen "in large part support the Applicant's testimony" as related above and accorded "less weight" to the opinions of Moisan, Pollock, and Orris, because they "did not perform any confirmatory testing with respect to the Applicant's alleged Latex allergy." Edwards seeks to disparage the testing done by Detjen and diminish its value by calling it "medically irrelevant" and "unimportant" and claiming, without basis, that Bansal found Detjen's test results "of no medical significance." Falsely attributing testimony and exaggerating other testimony is not proper argument and merits no consideration. We note that the Board acknowledged the limitations of the various allergy tests that were employed, including the probabilities of false positives; however, even Bansal testified that the more tests that result in a negative finding, the more likely that the results were accurate. Detjen performed the most numerous and recent tests in this case and he found no conclusive proof of a measurable latex allergy. The Board could properly place greater reliance on those test results even if those results could not be considered 100% accurate.

¶ 35    We conclude that the Board's decision was not against the manifest weight of the evidence, and we find no error here.

¶ 36    Edwards next contends that the Board ignored admissions allegedly made by the District, specifically in its filings with the Department of Human Rights. Specifically, she argues that the Board "made no effort to consider the DISTRICT'S interpretation of the medical opinion[s]" of the experts to whom the District sent her. According to Edwards, the District considered the opinions of Ebert, Coe, and Moisan in reaching its determination that "it would be dangerous" for her to return to work. The District filed answers before the Department of Human Rights, noting that since "the mere presence of latex elicited an allergic reaction, Respondent [the District] could not insure complainant's well-being out on the street" and that "allowing Complainant to respond to emergency calls posed a risk to her and the general public." Edwards argues that the Board must appropriately weigh the "expertise" of the District and that this court "must also give deference to that expertise."

¶ 37        This argument is a *non sequitur*. The District might possess the expertise to determine whether Edwards is capable of performing her job requirements without endangering herself or the general public; however, the District possesses no greater expertise in interpreting medical records than the Board possesses. Further, Edwards' fitness for duty was not the determination that the Board was required to make. The Board was required to determine whether Edwards incurred a sickness, accident, or injury; whether such sickness, accident, or injury was incurred in or resulted from the performance of an act of duty or from the cumulative effects of acts of duty; whether Edwards is mentally or physically disabled for service in the fire department; and whether her disability renders necessary her being placed on a disability pension. See 40 ILCS 5/4-110 (West 2008). The Board's decision involved consideration of many elements that are irrelevant to and beyond the scope of the District's conclusion regarding Edwards' fitness for duty. There is no indication that the Board failed to consider the District's conclusion; the Board acknowledged that Edwards "may have a sensitivity to Latex exposure" but concluded that "this sensitivity is not severe enough to constitute a disabling sickness *within the meaning of the Pension Code*" and that Edwards failed to prove that she was " 'permanently disabled' *within the meaning of the Pension Code.*" (Emphases added.) However, the District's conclusion, including its interpretation of the evidence before it, did not require more weight or deference than any other evidence presented to the Board.

¶ 38        It might seem incongruous that Edwards could be found unfit for duty because of a latex sensitivity yet be found ineligible for a pension based on the same physical infirmity. However, this court has previously considered this issue and found no conflict:

> "Whereas the Illinois Municipal Code (65 ILCS 5/1-1-1 *et seq.* (West 2002))–which governs employment of firefighters–does not specify the manner in which a municipality must prove cause for discharge (see 65 ILCS 5/10-2.1-17 (West 2002)), the requirements for obtaining a firefighter's disability pension are more specific and stringent. 'A disability pension shall not be paid unless three physicians selected by the Board have determined by examinations that the firefighter is disabled, together with such other evidence the Board deems necessary.' *Graves v. Pontiac Firefighters' Pension Board*, 281 Ill. App. 3d 508, 510 (1996), citing 40 ILCS 5/4-112 (West 1992). Given the compelling public interest in ensuring the fitness of firefighters to perform their duties, it is reasonable to conclude that the General Assembly deliberately set the bar lower for a municipality seeking to discharge an unfit firefighter than for a firefighter to obtain a disability pension, and committed the decisions to separate agencies with different missions." *Dowrick v. Village of Downers Grove*, 362 Ill. App. 3d 512, 521 (2005).

¶ 39        Edwards argues that the legislature overruled *Dowrick* when it amended section 4-112 of the Code in 2007. For support, Edwards includes as an appendix to her reply brief a printout of the status of Senate Bill 1553 in the 95th General Assembly. The printout includes a "Synopsis As Introduced" of Senate Bill 1553 (see http://www.ilga.gov/legislation/fulltext.asp?DocName=09500SB1553&GA=95&SessionId=51&DocTypeId=SB&LegID=&DocNum=15

53&GAID=9&Session), which Edwards quotes (" 'that the Board of Trustees' finding that a particular applicant is not or is no longer disabled shall constitute a conclusive presumption binding on the employing unit that the firefighter, emergency medical technician, or paramedic *is able to perform his or her job*' " (emphasis in original)) to support her assertion that the legislature "has eradicated any difference between a 'permanent disability' and a finding that a particular firefighter is 'not fit for duty.' "

¶ 40    We first note that Edwards quotes not from the statute itself, but from a "synopsis" contained on a legislative website. The fundamental rule of statutory construction is to ascertain and effectuate the intent of the legislature, the best evidence of which is the language employed in the statute itself. *City of Chicago v. St. John's United Church of Christ*, 404 Ill. App. 3d 505, 518 (2010). Perhaps Edwards could not find this language or this intent in the actual language of section 4-112 of the Code because it is not contained therein. Perhaps this is so because, as the very next paragraph on the website notes, "Senate Floor Amendment No. 1," which the Senate adopted on March 29, 2007, amended the bill by replacing "everything after the enacting clause." The synopsis of the amendment contains no mention of the language quoted by Edwards. Edwards relies on a secondary source's summary of a legislative proposal that was replaced by an amended proposal and she attempts to pass this off as an express provision of the legislature to overrule a holding of this court. This sleight of hand is not well-taken and borders on sanctionable.

¶ 41    Edwards next contends that the trial court erred in denying her motion to consolidate the administrative review case and the civil cause of action, pending in the law division before another Du Page County judge, that arose from Edwards' discrimination claim before the Department of Human Rights. Section 2-1006 of the Code of Civil Procedure provides:

> "An action may be severed, and actions pending in the same court may be consolidated, as an aid to convenience, whenever it can be done without prejudice to a substantial right." 735 ILCS 5/2-1006 (West 2010).

Consolidation is proper when two cases: (1) are of the same nature; (2) arise from the same act or event; (3) involve the same or like issues; and (4) depend largely on the same evidence. *La Salle National Bank v. Helry Corp.*, 136 Ill. App. 3d 897, 905 (1985). Illinois courts favor consolidation of causes where it can be done as a matter of judicial economy. *Lake County Forest Preserve District v. Keefe*, 53 Ill. App. 3d 736, 739 (1977). The trial court has broad discretion in determining the propriety of consolidation, and its decision will not be overturned on review absent a finding of an abuse of that discretion. *Turner v. Williams*, 326 Ill. App. 3d 541, 546 (2001). A trial court abuses its discretion when no reasonable person would agree with its decision. *In re M.P.*, 408 Ill. App. 3d 1070, 1073 (2011).

¶ 42    We can find no abuse of discretion in the trial court's refusal to consolidate the two actions. First, they are not of the same nature. This case is an administrative review action that, even in the trial court, involves a review of the Board's decision, based upon the evidence presented in the hearings before the Board; no new or additional evidence is to be heard by the court. See 735 ILCS 5/3-110 (West 2010). The law-division case is governed by the Code of Civil Procedure and would involve the full panoply of discovery, pretrial motion practice, and the introduction and consideration of all evidence properly admitted pursuant to

the Illinois Rules of Evidence (eff. Jan. 1, 2011). The Administrative Review Law is designed to ensure that the review of "any final administrative decision shall be heard and determined by the court with all convenient speed." 735 ILCS 5/3-110 (West 2010). We note that, while this case has already received review in the trial court and is now before the appellate court, the law-division case has not yet proceeded to trial. See https://www.dupagecase.com/Clerk/caseNumberSearch.do (case No. 2011L534, last visited Oct. 2, 2013). While the trial court assumes the role of a reviewing court in an administrative review, reviewing the findings and conclusions of the agency, the trial court (or a jury) would be required to be a fact finder in the law-division case. In addition, these cases involve different issues and parties. The law-division case involves alleged unlawful discrimination by the District and its chief, Donald Markowski; the Board is not a party to that case. This case involves neither Markowski nor the issue of discrimination. Simply put, the two cases are of different natures, involving different roles for the trial court, different standards, different rules of procedure and evidence, different parties, different issues, and different evidence. We cannot conclude that no reasonable person would agree with the trial court's decision to deny consolidation, and we find no error here.

¶ 43    Further, as the law-division case is still pending, this disposition should not be read to in any way indicate how this court would rule, or the lower court should rule, on any issue arising in that litigation.

¶ 44    For these reasons, the judgment of the circuit court of Du Page County is affirmed.

¶ 45    Affirmed.