# Illinois Official Reports

## Appellate Court

---

**Siwinski v. Retirement Board of the Firemen's Annuity & Benefit Fund,**
**2019 IL App (1st) 180388**

---

| | |
|---|---|
| Appellate Court Caption | LEAH SIWINSKI, Plaintiff-Appellant, v. THE RETIREMENT BOARD OF THE FIREMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO, Defendant-Appellee. |
| District & No. | First District, Fifth Division <br> Docket No. 1-18-0388 |
| Filed | February 1, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CH-01355; the Hon. Peter Flynn, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Jerome F. Marconi, of Chicago, for appellant. <br><br> Mary Patricia Burns, Vincent D. Pinelli, and Sarah A. Boeckman, of Burke Burns & Pinelli, Ltd., of Chicago, for appellee. |
| Panel | JUSTICE HOFFMAN delivered the judgment of the court, with opinion. <br> Justices Hall and Lampkin concurred in the judgment and opinion. |

¶ 1    The plaintiff, Leah Siwinski, appeals from an order of the circuit court of Cook County which confirmed a decision of the Retirement Board of the Firemen's Annuity and Benefit Fund of the City of Chicago (Board), denying her a duty disability pension under section 6-151 of the Illinois Pension Code (Code) (40 ILCS 5/6-151 (West 2016)). For the reasons that follow, we (1) reverse the decision of the Board, (2) reverse the decision of the circuit court, and (3) remand the matter to the circuit court, with directions.

¶ 2    The following factual recitation is taken from the evidence presented at the Board's hearing on the plaintiff's application for a duty disability pension. Her case-in-chief included her own testimony, along with testimony from her clinical social worker, James Gilligan; her partner at the Chicago Fire Department (CFD), Daniel Kelly; and her supervisor, Assistant Deputy Chief James O'Connell. When appropriate, we supplement the witnesses' evidence with information from the medical notes, reports, and CFD files of record.

¶ 3    The plaintiff, in her testimony and affidavit, stated that she began working as a paramedic for CFD in December 2008. Her duties included responding to 911 calls and transporting individuals to hospitals. On December 22, 2010, she and Kelly responded to a "[m]ayday" call involving injured firefighters. When she arrived at the scene, firefighters placed the body of a firefighter whom she recognized on her stretcher. She had transported nonresponsive individuals "quite a few" times without being affected but "wasn't prepared to have somebody that [she] had worked with dead on [her] stretcher" and felt like it "could have been [her]." At that moment, she "mentally and emotionally *** turned off" and "couldn't hear any noise, *** [or] notice any lights." The rest of the incident was a "blur," but she finished her shift as required. Later, the plaintiff saw videos and photographs of her carrying the stretcher and attended the funerals of the firefighters who died.

¶ 4    According to the plaintiff, during the following months she became hypervigilant, felt startled when the alarm at the firehouse sounded, experienced anxiety while on calls, withdrew from her family and friends, and developed problems in her romantic relationship. In June 2011, she was hospitalized after becoming "near syncopal" while taking a patient's blood pressure. In August 2011, she went on leave for "non-duty illness," and multiple doctors told her that the syncope related to anxiety. As she was already seeing a therapist and did not want to "admit" that her syncope was caused by anxiety, she did not seek further treatment and returned to work in March 2012.

¶ 5    The plaintiff stated that, on October 12, 2012, she heard gunshots near her firehouse and was dispatched to the scene of the shooting where a large crowd stood by the body of a victim who had been shot in the head. When the paramedics confirmed that he was dead, people in the crowd closed around them and threw objects, used racial slurs, accused them of not doing their job, and threatened to kill them. Police officers restrained the victim's sister, who attempted to reach the plaintiff, but she felt "frozen in fear" and thought she would be killed. Although she had been threatened on other calls, that incident caused her to "br[eak] down," and for several weeks, she feared that she would be "shot in retaliation for not saving [the victim's] life." Due to the "stigma" of talking about her feelings as a first responder, she did not tell anyone how she felt and enrolled in college courses to avoid thinking about work. However, she began failing her classes, her romantic relationship ended, and she felt herself "spiraling out of

control." She stopped cleaning and cooking, showered less frequently, struggled to leave bed, and developed a shopping addiction.

¶ 6    The record shows that, in June 2013, the plaintiff began working as a "driver," or "divisional aide," to Assistant Deputy Chief O'Connell. As established by the plaintiff in her affidavit, and by subsequent testimony at the hearing from Assistant Deputy Chief O'Connell, the plaintiff's work as a divisional aide was "off of the streets" and her duties included scheduling, processing paperwork, and managing disciplinary and training files.

¶ 7    The plaintiff further testified that, in November 2013, she was dispatched to a hospital to meet with an ambulance crew that had transported a firefighter who shot himself in the head. She knew the firefighter and saw him on life support when she arrived. The following month, she began cutting herself as a "coping mechanism" when therapy and medication failed to help. She felt "hopeless and alone," experienced nightmares, anxiety, and depression, and was "afraid of [her] job." In January 2014, her symptoms became "unbearable" and she "decided that [she] needed to get help." On January 25, 2014, she "explained the situation" to Chief Bob Ertl, who placed her on medical leave.

¶ 8    The plaintiff explained that her therapist, Myriah Vargo, directed her to a residential treatment facility where she was diagnosed with major depressive disorder and post-traumatic stress disorder (PTSD) in February 2014. For five or six months, she attended inpatient and outpatient programs in Illinois and Florida. In October 2014, she began treating with Gilligan, who specialized in PTSD. As of the date of the hearing, she still experienced hypervigilance, isolation, intrusive thoughts, and nightmares. Ambulance lights and sirens produced "flashback[s]" and "strong anxiety," and wearing a uniform "trigger[ed]" her to cut herself. She could not "sleep" or "function" due to "images of calls" that she had been on and her fear of being "violently killed" like some of the victims she had seen, and added that the December 2010 incident "haunts [her] thoughts every day and night."

¶ 9    On cross-examination, the plaintiff agreed that she was able to work as a divisional aide from June 2013 through January 2014 and that she had personal and family histories of depression, which she did not disclose on her application to work for CFD. She explained that she had been unaware of her family history when she applied for her job and had not experienced depression since high school. Additionally, she mistakenly believed that the application asked whether she had depression at the time she was applying and that another question, which asked whether she had "any other medical problems," did not contemplate mental health conditions. She recalled telling her mental health history to only one of the physicians who treated her for syncope and acknowledged that a doctor who examined her in November 2013 diagnosed her with attention deficit hyperactivity disorder but not PTSD.

¶ 10    During the plaintiff's cross-examination, the Board's counsel introduced records from her outpatient program in August 2014, which stated that she "does not like her job and really does not want to return" but also "feels she should stick it out for five years to be eligible for a pension and does not want to let her co-workers down." The plaintiff explained that her statement only expressed how she felt on that particular day and that, as a matter of "pride," she wanted to work as a paramedic for at least 10 years. She added that she was not accruing service time creditable to her pension while she was on leave and that she wanted to return to work as soon as possible.

¶ 11    Gilligan testified that he had treated patients with PTSD for approximately 15 years and that he diagnosed the plaintiff with PTSD "coming from [her] job." In a letter, he stated that the

plaintiff's "delay in discussing her trauma" resulted from her need to avoid memories of traumatic incidents, which "is a common temporary coping mechanism for individuals with PTSD." He added that PTSD's symptoms usually do not manifest until six months after the underlying incident and that working "out of the field," as a divisional aide, worsened her symptoms because she had more time to think about her traumatic experiences.

¶ 12    Kelly and Assistant Deputy Chief O'Connell testified that the plaintiff was dependable and had a "top shelf" reputation as a paramedic and divisional aide. Kelly corroborated her account of the incidents in December 2010, June 2011, and October 2012. He added that, when they were surrounded by the crowd, she was visibly more nervous than on similar occasions and, around that time, "started to jump" when alarms sounded at the firehouse. Assistant Deputy Chief O'Connell stated that the plaintiff never reported any mental conditions that prevented her from performing her duties, although he was transferred to another firehouse before she went on medical leave in January 2014.

¶ 13    The Board, in its case-in-chief, called Dr. Cathrine Frank, a psychiatrist specializing in mood and anxiety disorders, and its consulting physician, Dr. George Motto. At the Board's request, Drs. Frank and Motto examined the plaintiff on June 3, 2015, and March 17, 2015, respectively.

¶ 14    Dr. Frank, in her testimony and written report, stated that she diagnosed the plaintiff with (1) PTSD with delayed expression and (2) mild recurrent major depressive disorder. She explained that, while individuals with a history of major depressive disorder may be more at-risk for developing PTSD, the two conditions are "very different." PTSD requires that an individual experience trauma or be exposed to another person's trauma, and its symptoms include both reexperiencing the trauma through intrusive thoughts, flashbacks, or nightmares, and avoiding trauma-related stimuli. Major depressive disorder, in contrast, may occur without a precipitating event and involves negative changes to cognition and mood, but without the same "degree of detachment and fear."

¶ 15    Based on the plaintiff's episodic depression, four suicide attempts between grades 8 and 11, and a "strong" family psychiatric history, Dr. Frank opined that she suffered from major depressive disorder prior to joining CFD. However, while certain events in the plaintiff's personal life that occurred during her employment—including the end of a romantic relationship and the death of her grandmother—may have triggered an episode of major depressive disorder, she "did not exhibit signs or symptoms of PTSD until she was exposed to work related traumas." In support of this conclusion, Dr. Frank observed that the plaintiff (1) witnessed trauma as part of her daily work; (2) experienced trauma during the incidents in December 2010 and October 2012; (3) had flashbacks and nightmares; (4) avoided stimuli like paramedic uniforms, sirens, and ambulances; (5) felt unsafe in safe situations; and (6) reported fear, guilt, detachment, irritability, hypervigilance, sleep disturbance, and self-destructive behavior. These symptoms, according to Dr. Frank, involved "stimuli related to her job as a paramedic or working for the fire department" and did not result from "a general medical condition." Although the plaintiff was not diagnosed with PTSD until early 2014 and, like "[m]ost of the indices" for PTSD, her symptoms were self-reported, Dr. Frank noted that PTSD may occur "years" after trauma, the plaintiff described her symptoms consistently to different professionals over time, and "two people [may] experience exactly the same trauma" but only one might developed PTSD. Additionally, although the plaintiff "at times" felt anxiety and stress due to events in her life prior to joining CFD, Dr. Frank explained that those

instances "aren't the same thing as having Post-Traumatic Stress Disorder," and were different from the "constellation of symptoms" that she now reported.

¶ 16 Because the plaintiff's major depressive disorder predated her PTSD, and she functioned as a paramedic when she had the former condition but not the latter, Dr. Frank concluded that PTSD, and not major depressive disorder, precluded her from working as a paramedic. Dr. Frank stated:

"[The plaintiff] has specific triggers of her anxiety that are stimulus bound to aspects of her profession, such as wearing or seeing a paramedic uniform, hearing the siren, or seeing an ambulance. These triggers, which would be daily in her profession as a paramedic, provoke increased anxiety, flashbacks, fear, and nightmares *** [and] impact her ability to safely and efficiently perform her duties."

Dr. Frank noted that the plaintiff's work as a divisional aide did not cause her PTSD, but stated that, because her triggers included "multiple cues related to trauma," it was "unlikely" that she could perform nonparamedic duties "unless such duties were protected from any exposure to trauma." As "re-exposure to trauma would be common" while working for CFD, Dr. Frank concluded that her chances of returning to work were "poor."

¶ 17 Dr. Motto testified in reference to his written report. He was "not sure" whether he accepted Dr. Frank's diagnosis that the plaintiff had PTSD, as CFD's files did not indicate that she or anyone else reported that "she was unable to continue performing her job." According to Dr. Motto, it appeared that she "removed herself from duty *** not because she couldn't perform her duties objectively," but because she and Vargo "decided that she had to go" into a residential treatment facility. Dr. Motto noted that her reasons for residential treatment, as recorded in her medical records, were "self-reported" and "not contemporaneous" and posited that, irrespective of her symptoms, she was not disabled because she performed her duties "right until" her last day of work and "whatever was going on did not interfere with her being an exceptional paramedic." In reaching this conclusion, Dr. Motto acknowledged that he specialized in internal medicine and endocrinology and was not making "a psychiatric opinion." He had never diagnosed a patient with PTSD, and had assessed "four or five" individuals applying for benefits based on mental conditions in 43 years of practice.

¶ 18 On December 16, 2015, the Board issued a unanimous written decision denying the plaintiff's application for a duty disability pension. The Board stated that the plaintiff's PTSD diagnosis was "not well supported" because (1) she did not report her symptoms until several years after the underlying incidents occurred; (2) those incidents were common to paramedic work; (3) her diagnosis relied on "self-report[ed]" symptoms without "independent verification"; and (4) her self-reporting was not credible in light of her explanation for failing to provide her mental health history when she applied for her job, her delay in reporting her symptoms to "CFD or any other treating physician," and her statements in treatment that suggested "a possible secondary motivation" for seeking a duty disability pension. The Board also determined that the plaintiff was not disabled, as she excelled as a paramedic and division aide, did not seek medical leave for mental health conditions or report mental health symptoms in connection to her syncopal episodes, and further, Dr. Motto "found no evidence to demonstrate that [she] could not perform her duties as a [p]aramedic due to a physical or mental condition" between December 2008 and January 2014. Finally, the Board found that any alleged disability did not result from an act of duty but, rather, "the recurrence of [the plaintiff's] major depressive disorder and self-harming behavior" due to a preexisting "mental

health condition" and "circumstances in [h]er personal life." In so holding, the Board noted that the Code defines an act of duty in similar terms for policemen and firemen and that, in evaluating police officers' disability claims arising from duty-related stress, "courts have required that *** officers demonstrate that their psychological disability is the result of a specific, identifiable act of duty unique to [their] work."

¶ 19 The plaintiff filed a complaint for administrative review of the Board's decision in the circuit court of Cook County. On December 7, 2016, the court entered a written order vacating the Board's decision and remanding the matter for further proceedings. The court rejected the Board's finding that the plaintiff did not have PTSD, as Gilligan and Dr. Frank diagnosed her with PTSD, Dr. Motto lacked expertise in PTSD and did not "question that diagnosis," and "delayed diagnosis and 'self-reporting'" are "common characteristics of PTSD." Additionally, the court found that the Board erred by relying on the definition of act of duty that is applicable to police officers, as firefighters may establish a disability based on cumulative acts that cause or contribute to an injury. The court noted, however, that the record was "unclear" whether the plaintiff's PTSD disabled her from working as a divisional aide, as the Board's decision and the evidence of record primarily addressed her work as a paramedic. Therefore, the court directed the Board to "specifically address" whether the plaintiff was disabled from " 'performing any assigned duty' " with CFD, including working as a divisional aide, and that "the Board may, if it wishes, call for further evidence from the parties."

¶ 20 Notwithstanding the circuit court's order, the Board neither presented nor elicited any additional evidence or argument as to whether the plaintiff was disabled from performing any assigned duty when it convened on March 15, 2017. Instead, the transcript of proceedings shows that the Board unanimously voted, again, to deny her application for disability benefits based on "the record and all of the exhibits and all of the information, [and] the transcripts of the [first] hearing." In a written decision issued that day, the Board determined that, for reasons similar to its first decision, the plaintiff did not have PTSD and was not disabled and added that she could "perform her assigned duties" as a divisional aide and that no evidence suggested that those duties "caus[ed] or contribut[ed] to any symptoms of PTSD." The Board also found that the plaintiff's alleged disability did not result from an act of duty, again relying on the definition of act of duty that is applicable to police officers.

¶ 21 The plaintiff sought a review of the Board's decision on remand in the circuit court of Cook County. She requested (1) reversal of the Board's denial of duty benefits, with an award retroactive to the date that she was removed from CFD's payroll, and (2) attorney fees and costs pursuant to section 6-222 of the Code (40 ILCS 5/6-222 (West 2016)).

¶ 22 On June 21, 2017, the circuit court entered a written order affirming the Board's decision on remand. The court noted that the Board "reprise[d] *** its original decision" and "all but ignored" the court's order of December 7, 2016. However, although the Board failed to "revisit" whether the plaintiff could perform any assigned duty for CFD, the court observed that the burden of proof rested with her and that, on remand, she did not attempt to supplement the record as to that issue. Because the record lacked sufficient evidence to reverse the Board's decision on remand, and further proceedings might result in a "standoff," the court confirmed the Board's decision but observed that the plaintiff could file a new application for nonduty disability benefits. The court denied the plaintiff's motion to reconsider, and this appeal followed.

¶ 23        Before addressing this appeal, we must admonish the plaintiff's counsel for his failure to comply with Illinois Supreme Court Rule 342 (eff. July 1, 2017). Rule 342 requires an appellant to include in her brief an appendix with, among other things, "a complete table of contents, with page references, of the record on appeal." *Id.* The plaintiff's appellant brief omits a table of contents of the record, which contains more than 700 pages of pleadings, exhibits, and transcripts. We remind counsel that our Illinois Supreme Court rules "are not advisory suggestions, but [rather,] rules to be followed," and it is within this court's discretion to dismiss an appeal for an appellant's failure to follow those rules. *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57. However, because we have the benefit of a cogent appellee's brief and it is possible to locate the relevant documents in the record, we will address the merits of this appeal. See *Twardowski v. Holiday Hospitality Franchising, Inc.*, 321 Ill. App. 3d 509, 511 (2001).

¶ 24        On appeal, the plaintiff contends that the Board erred in denying her application for a duty disability pension where the evidence established that she sustained PTSD in performing her job as a paramedic and, as a result, was disabled from performing any assigned duties for CFD. The Board, in response, maintains that the evidence did not establish that the plaintiff had PTSD or that her condition resulted from an act of duty and precluded her from working as a paramedic or divisional aide.

¶ 25        As this matter involves an appeal from a judgment of the circuit court in an administrative review action, we review the decision of the Board, not the determination of the circuit court. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504 (2007). Our standard of review depends upon the nature of the question we are addressing. As to questions of fact, we apply the manifest weight standard, and as to questions of law, our review is *de novo*. *Id.* at 504-05. When the " 'historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard,' " a mixed question of law and fact exists and the standard of review is whether the Board's determination is clearly erroneous. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 391 (2001) (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982)).

¶ 26        The plaintiff submits that this appeal involves a mixed question of law and fact, namely, whether she is "disabled within the meaning of the *** Code" based on "the undisputed facts contained in the record." We disagree. The plaintiff challenges the Board's determination that she failed to prove that she sustained an injury, failed to establish that her injury resulted from an act of duty, and failed to demonstrate that, due to her injury, she was unable to perform her assigned duties for CFD. All these questions are questions of fact, for which the Board's findings are considered to be "*prima facie* true and correct" and will not be disturbed unless they are against the manifest weight of the evidence. 735 ILCS 5/3-110 (West 2016); *Wade*, 226 Ill. 2d 504.

¶ 27        An agency's finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, and not based upon any evidence. *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 271 (2004). Thus, although it is not a reviewing court's function "to reweigh evidence or to make an independent determination of the facts" (*Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 463 (2009)), an agency's factual determination "is not sufficient if upon a consideration of all the evidence the finding is against the manifest weight" (*Bowlin v. Murphysboro Firefighters Pension Board of Trustees*, 368 Ill. App. 3d 205, 211-12

(2006)). When the record does not show evidentiary support for the agency's determination, a reviewing court will not hesitate to grant relief. *Id.* at 212.

¶ 28 Relevant to this appeal, the Code provides different pension benefits depending upon the circumstances of a paramedic's disability. A paramedic who is "disabled" due to "a specific injury" or "cumulative injuries" that result "from an act or acts of duty" is entitled to a duty disability pension equal to 75% of her salary. 40 ILCS 5/6-151 (West 2016). Pursuant to the Code, a disability is defined as "[a] condition of physical or mental incapacity to perform any assigned duty or duties in the fire service." 40 ILCS 5/6-112 (West 2016). An act of duty, in turn, refers to "[a]ny act" imposed by law on an active paramedic or which she performs "while on duty, having for its direct purpose the saving of the life or property of another person." 40 ILCS 5/6-110 (West 2016). Thus, a paramedic applying for a duty disability pension must establish that (1) an injury occurred; (2) the injury resulted, at least in part, from an act of duty or the cumulative effects of acts of duty; (3) due to the injury, she is disabled from any assigned duty in the fire service; and (4) the disability necessitates the award of a disability pension. *Edwards v. Addison Fire Protection District Firefighters' Pension Fund*, 2013 IL App (2d) 121262, ¶ 32.

¶ 29 The record shows that the plaintiff experienced traumatic situations while on duty as a paramedic in December 2010, when she carried a stretcher that held the body of a firefighter with whom she had worked, and in October 2012, when she was threatened by a crowd that had gathered near the body of the victim of a shooting. She testified that, as a result of these events, she became hypervigilant, felt startled when the alarm at the firehouse sounded, experienced anxiety while on calls, and withdrew from relationships. During the same period, she was hospitalized after becoming "near syncopal" due to anxiety. She enrolled in college classes to avoid thinking about work; struggled with cleaning, cooking, showering, and leaving bed in the morning; and developed a shopping addiction. In December 2013, she began cutting herself as a "coping mechanism" and felt "afraid of [her] job." Although she acknowledged that she was able to work as an administrative aide through January 2014, she explained that, by the time she went on medical leave, her nightmares, anxiety, depression, and other symptoms had become "unbearable."

¶ 30 The record reveals that the plaintiff was diagnosed with PTSD during residential treatment in February 2014. Her therapist, Gilligan, who had 15 years' experience treating patients with PTSD, also diagnosed her with PTSD. He found that her condition resulted from her work as a paramedic and noted that her employment as a divisional aide worsened her symptoms. Dr. Frank, the Board's psychiatric expert, also diagnosed the plaintiff with PTSD arising from work-related trauma and concluded that her PTSD, rather than her preexisting major depressive disorder, disabled her from working as either a paramedic or divisional aide. In particular, Dr. Frank noted that the plaintiff's PTSD triggers "are stimulus bound to aspects" of working as a paramedic, including "wearing or seeing a paramedic uniform, hearing the siren, or seeing an ambulance," and explained that the plaintiff's anxiety, flashbacks, and fear prevented her from "safely" performing her duties. Because "re-exposure to trauma would be common" while working for CFD, Dr. Frank considered it "unlikely" that the plaintiff could perform nonparamedic duties for CFD. In contrast to Gilligan and Dr. Frank, the Board's other witness, Dr. Motto, did not offer an opinion as to whether the plaintiff had PTSD and whether it resulted from her employment but posited that, irrespective of her condition and its cause,

she was not disabled from working for CFD because she was able to perform her duties "right until" her last day of work.

¶ 31   As noted, the Board determined that (1) the plaintiff did not have PTSD, (2) any alleged disability did not result from an act of duty, and (3) she was not disabled from working for CFD. However, even with due deference to the Board's role as finder of fact, each of its conclusions is problematic in light of the evidence adduced at the plaintiff's hearing.

¶ 32   First, the Board did not rely on any medical evidence in finding that the plaintiff did not have PTSD. Instead, the Board noted that her diagnosis reflected self-reported symptoms that were documented several years after the traumatic events in December 2010 and October 2012 and that those events were common to paramedic work. Additionally, the Board stated the plaintiff's self-reporting was not credible because she omitted information regarding her mental health history when she applied to work for CFD and, during treatment, suggested that she might be reticent to return to work because she disliked her job. None of these rationales supports a finding that the plaintiff failed to establish that she had PTSD. Gilligan and Dr. Frank testified that PTSD may manifest long after trauma occurs, its symptoms are typically self-reported, and the plaintiff described her symptoms consistently to different professionals over time. Whether the plaintiff's traumatic experiences were common to paramedic work has no bearing on whether they caused her PTSD; to the contrary, Dr. Frank explained that "two people [may] experience exactly the same trauma" but only one might develop PTSD. Moreover, it is well-established that "tangential issues" that do not "impact the plaintiff's veracity concerning his injury" do not, of themselves, destroy the plaintiff's credibility regarding her injury. *Lambert v. Downers Grove Fire Department Pension Board*, 2013 IL App (2d) 110824, ¶ 25. In this case, the plaintiff's statements and omissions in her job application are unconnected to whether events that occurred years later caused her PTSD, particularly where Dr. Frank explained that her PTSD was not related to her preexisting major depressive disorder. Based on the foregoing, it is apparent that the Board's determination that the plaintiff did not have PTSD was against the manifest weight of the evidence.

¶ 33   For similar reasons, the Board's finding that the plaintiff's condition did not result from an act of duty is also unsupported. In finding that the plaintiff's symptoms were caused by her preexisting major depressive disorder and circumstances in her personal life, the Board ignored Dr. Frank's testimony that (1) the plaintiff "did not exhibit signs or symptoms of PTSD until she was exposed to work related traumas," namely, the incidents in December 2010 and October 2012; (2) the stress and anxiety that she experienced due to events in her personal life were not comparable to the symptoms that she experienced as a result of her job; and (3) because the plaintiff's depression predated her PTSD, and she functioned at work while she had the former condition but not the latter, her disabling condition was PTSD and not depression. Notably, Dr. Motto's testimony added no support for the Board's causation findings, as he did not refute that the plaintiff had PTSD, he lacked psychiatric expertise or experience examining applicants seeking benefits based on mental conditions, and he expressly stated that he was not making "a psychiatric opinion." The Board, therefore, was not tasked with choosing between the evidence of "[w]itnesses qualified in their fields," who "stated their opinions and gave their reasons for those opinions." (Internal quotation marks omitted.) *Snelson v. Kamm*, 204 Ill. 2d 1, 36 (2003). Instead, Dr. Motto conceded that he lacked relevant expertise, and the Board's other witness, Dr. Frank, diagnosed the plaintiff with PTSD and cogently explained why her condition resulted from her employment with

CFD. The Board's finding that the plaintiff's condition did not result from an act of duty is, therefore, against the manifest weight of the evidence.

¶ 34 Because the manifest weight of the evidence showed that the plaintiff's PTSD resulted from at least one act of duty, we need not reach the plaintiff's further contention that the Board erroneously applied criteria for a duty disability that are applicable to police officers rather than firefighters. Compare 40 ILCS 5/3-114.1 (West 2016) (allowing police disability pensions for injuries "resulting from the performance of an act of duty") with 40 ILCS 5/6-151 (West 2016) (allowing firefighter disability pensions for injuries caused by "a specific injury, or *** cumulative injuries, *** resulting from an act or acts of duty"). While the Board's reliance on a statute applicable to police officers is incongruous, it does not change the fact that the only competent evidence of record established a causal connection between the plaintiff's PTSD and at least one act of duty while working for CFD.

¶ 35 Finally, the Board concluded that the plaintiff's condition did not preclude her from working for CFD, as she had not previously sought duty-related medical leave and, based on Dr. Motto's opinion and other testimony, successfully performed her duties as a paramedic and divisional aide until the last day of work. While the Board's observations are true, they reflect only part of the evidence that was presented at the plaintiff's hearing. As Dr. Frank and Gilligan established, the symptoms of PTSD may manifest well after trauma occurs. Thus, the fact that the plaintiff could execute her duties as a paramedic and divisional aide for a period of time following the incidents in December 2010 and October 2012 does not show that her condition did not disable her from performing her job by January 2014. Notably, Dr. Frank explained that the plaintiff's PTSD is "stimulus bound to aspects of her profession," including "wearing or seeing a paramedic uniform, hearing the siren, or seeing an ambulance." Because those triggers are always present in the plaintiff's work as a paramedic and cause her "anxiety, flashbacks, fear, and nightmares," Dr. Frank concluded that they "impact her ability to safely and efficiently perform her duties." Given the low likelihood that the plaintiff could avoid exposure to trauma while working in a nonparamedic capacity for CFD, Dr. Frank also stated that she was also disabled from working as a divisional aide. Gilligan similarly found that the plaintiff's PTSD resulted "from [her] job" and that working as a divisional aide worsened her symptoms because she had more time to think about her traumatic experiences. Viewing the evidence together, it is apparent that the plaintiff's PTSD disabled her from working for CFD.

¶ 36 In summary, because the manifest weight of the evidence showed that the plaintiff sustained PTSD arising from an act or acts of duty while working for CFD and, as a result, was disabled from performing any of her assigned duties, we reverse the decision of the Board that denied her a duty disability pension and reverse the decision of the circuit court, which confirmed the Board's decision. We remand the matter to the circuit court, with directions, to (1) conduct a hearing to determine the attorney fees and costs to which the plaintiff is entitled pursuant to section 6-222 of the Code (40 ILCS 5/6-222 (West 2016)); and (2) enter an order remanding the matter to the Board for an award of duty disability benefits retroactive to the plaintiff's last day of employment, January 25, 2014.

¶ 37 Reversed and remanded with directions.